Filed 6/19/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S078895 |
| v. | ) | |
| | ) | |
| VAENE SIVONGXXAY, | ) | |
| | ) | Fresno County |
| Defendant and Appellant. | ) | Super. Ct. No. F97590200-2 |
| _____ | ) | |

Following a bench trial, defendant and appellant Vaene Sivongxxay was convicted of one count of first degree murder (Pen. Code, § 187),[1] 13 counts of robbery (§§ 211, 212.5), and two counts of attempted robbery (§§ 664, 211, 212.5).  The trial court found true the special circumstance allegation that defendant committed the murder during the commission of a robbery.  (§ 190.2, subd. (a)(17)(A).)  At the conclusion of the penalty phase bench trial, the court imposed a verdict of death.

This appeal is automatic.  (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)  We affirm the judgment in its entirety.

## I.  FACTS

Defendant was tried jointly with codefendant Oday Mounsaveng.  Both defendants were tried by a judge sitting without a jury.

---

[1]    All subsequent statutory references are to the Penal Code.

**SEE CONCURRING & DISSENTING OPINIONS**

**A. Guilt Phase**

*1. Prosecution Evidence*

Defendant and Mounsaveng committed a series of robberies in Fresno between July and December 1996.

*a. Thanh Tin Jewelry Attempted Robbery*

On July 31, 1996, Mounsaveng walked into the Thanh Tin Jewelry store, asked to examine a gold chain, and then left. He returned with defendant about an hour later. The men looked around for a long time without buying anything. Liem Phu Huynh, the owner of the jewelry store, asked the men why they were taking so long. Mounsaveng and defendant claimed they were brothers and were waiting for their sister to arrive. Eventually, they left.

When defendant and Mounsaveng returned to the store later that afternoon, Huynh was working in a back room, and his wife Phung Ngoc Ho was behind the sales counter. After asking to examine several items, Mounsaveng pulled a handgun out of his waistband, grabbed Ho by the collar, and pointed the gun at her. Huynh, who was watching from the back room, set off an alarm. Mounsaveng and defendant fled.

*b. First JMP Mini-Mart Robbery*

On the afternoon of August 16, 1996, Bobbie Her was working behind the counter at her parents' convenience store, JMP Mini-Mart. Mounsaveng entered and asked whether the store cashed checks. When Bobbie answered that it did, Mounsaveng left. He eventually returned with defendant, and the two men milled about the store. Bobbie's father Xeng Wang Her arrived and began restocking drinks in the store's refrigerator case. Defendant walked up to Xeng, pointed a handgun at him, and forced him to walk toward the cash register. Defendant then forced Xeng to lie down and kicked him in the back of the head. Meanwhile, Mounsaveng jumped over the counter and forced Bobbie to open the cash register.

2

Mounsaveng and defendant took all of the money in the store, ripped a cordless phone off the wall, and then fled in a blue pickup truck.

### c. Phnom Penh Jewelry Robbery

On October 10, 1996, defendant entered the Phnom Penh Jewelry store. Mounsaveng followed a few minutes later and asked the store's owner, Kee Meng Suy, to repair a Buddha pendant. Suy recognized Mounsaveng because he had brought in the same pendant for repair a few months before. Suy took the pendant to his workbench in the store's back room. While Suy was working, his wife Suntary Heng showed Mounsaveng some other pieces of jewelry. Suy finished repairing the pendant and handed it back to Mounsaveng, who said he was not satisfied with the work and asked Suy to do it again. Suy returned to his work bench. Heng then took the couple's two young children, who were at the store that day, into the back room to get some food.

At that point, defendant and Mounsaveng forced their way into the back room, pointed guns at Suy's head, and told him to "stay still." Defendant and Mounsaveng punched Suy, pushed him to the floor, and used tape and an extension cord to bind his limbs and cover his mouth and eyes. Both men then punched, kicked, and stomped Suy as Heng and the couple's two children watched. Mounsaveng demanded Suy's gun and the videotape from the store's security camera, but Heng explained he had no gun and the camera was broken. Eventually, Suy lost consciousness. As Mounsaveng and defendant cleared out the store's safe and the jewelry in its display cases, Heng activated a silent alarm. The two men fled in a light blue Honda.

### d. Second JMP Mini-Mart Robbery

Mounsaveng and defendant returned to the JMP Mini-Mart on December 14, 1996. Xeng Wang Her was working in the store with his wife,

3

Phayvane Boulome, and there were five or six customers inside. Upon entering the store, both Mounsaveng and defendant pulled out guns, told the customers to lie on the ground, and demanded that Xeng and Boulome open the cash register. Mounsaveng took money from the cash register and also picked up Xeng's gun, which was underneath the counter. Mounsaveng then forced Xeng into a back room, where Mounsaveng took cigarettes and change. After that, Mounsaveng grabbed Boulome and demanded that she open a second cash register, but she explained it was broken. Before leaving, Mounsaveng and defendant took money and jewelry from the customers at gunpoint. In the course of robbing the customers, defendant kicked an elderly woman in the mouth. One customer recalled seeing an unoccupied white car outside the store with its engine running.

### e. Sean Hong Jewelry Robbery and Murder

In November 1996, defendant sold some rings and other items to the Sean Hong Jewelry store. He also left a Buddha pendant to be repaired.

On December 19, 1996, three days after the second JMP Mini-Mart robbery, Mounsaveng and defendant paid a visit to the Sean Hong store. Seak Ang Hor, the wife of store owner Henry Song, was working behind the sales counter. Hor told defendant that his Buddha pendant was ready to be picked up, but he said he did not have the money to pay for it. Mounsaveng asked to see the pendant anyway. Song retrieved the pendant from a safe in the store's back room and came out to show it to Mounsaveng and defendant.

After the men were finished looking at the pendant, Song started walking toward the back room. Mounsaveng pulled out a gun and screamed "give the money and gold." Defendant also brandished a gun. Defendant and Mounsaveng forced Song and Hor into the back room; Mounsaveng then left and closed the door. Defendant demanded that Hor open the safe, but she refused. Song

4

attempted to grab defendant's gun, and the two men engaged in a hand-to-hand struggle. Mounsaveng returned to the back room and beat Song on the head with his gun. Hor pressed a silent alarm button, prompting Mounsaveng to pull her out of the back room. Once in the front area of the store, Hor kicked the wall in an effort to alert the business owner next door. At some point, she heard Mounsaveng say "let's go." Defendant forced Hor to give him cash from her purse. He also smashed a display case and took jewelry.

After Mounsaveng and defendant left, Hor found her husband lying on the floor of the back room with blood coming out of his mouth. Song died within the hour. The cause of death was perforation of the heart and lungs from three gunshot wounds.

Hor did not see either of the robbers shoot her husband, nor did she recall hearing the gunshots. However, the robbery was partially captured on the store's video camera. A Fresno Police Department detective testified that in reviewing a video of the incident, he could identify a moment when several gunshots were audible. At that moment, defendant and Song were not in the camera's frame, but Mounsaveng and Hor were. Mounsaveng was pointing his gun toward the location where defendant and Song were fighting. After the shots were fired, Mounsaveng moved out of the frame and toward the back room, where defendant and Song had been fighting. Ballistics evidence showed that all of the bullets were fired from the same gun. In the video, one of the defendants is heard to say, "shoot, shoot."

Defendant was arrested on February 12, 1997, and agreed to be interviewed by a Fresno Police Department detective. He initially denied involvement in the robberies. However, after the detective showed him stills from the Sean Hong Jewelry store's video camera, defendant admitted he took part in the robbery. At first, he claimed Mounsaveng was the one who shot Henry Song. Defendant

5

described his struggle with Song and claimed that Song hit him on the head with a chair. But when the detective asked how the struggle ended, defendant confessed that he, not Mounsaveng, had shot Song. He apologized for lying at the outset of the interview and said he was sorry to Song's family for what he had done. Defendant also told the detective that Mounsaveng forced him to rob the Sean Hong Jewelry store and that he was so high on cocaine that day he could hardly think.

### 2. *Defense Evidence*

A toxicologist who screened defendant the day after his arrest testified that his blood tested positive for alcohol and cocaine. The manager of an apartment building located near the JMP Mini-Mart (Mini-Mart) testified that on December 14, 1996, the day of the second Mini-Mart robbery, he saw two teenagers running down the street, one of whom had a ponytail. Police later found a stolen white Toyota Camry in the parking lot of the apartment building. An officer who tested latent fingerprints from the Thanh Tin Jewelry store and the second Mini-Mart robbery testified that none of the prints matched defendant or Mounsaveng. A different officer testified that none of the witnesses to the second Mini-Mart robbery mentioned in their initial interviews that the robbers had tattoos. Finally, defense counsel introduced records indicating that defendant was in prison in Washington State from 1993 until February 1996, which countered Mounsaveng's allegation that defendant was among a group of men who threatened him in December 1995 and January 1996. In closing argument, defense counsel challenged the eyewitness identifications of his client, suggested that defendant perceived himself to be under imminent threat during his struggle with Song, and asserted that defendant may have been under the influence of drugs or coerced by Mounsaveng.

6

Mounsaveng admitted his role in the robberies but claimed he acted under duress.

### 3. Trial Court's Findings

The trial court found both defendants guilty of first degree murder. The court also found "beyond a reasonable doubt that the special circumstance against each defendant ha[d] been proven," stating that "[t]here is no doubt that this murder was committed during the commission of the robbery" of the Sean Hong Jewelry store. In addition, the court found both defendants guilty of 13 counts of robbery and two counts of attempted robbery, and it found insufficient evidence to support either defendant's duress defense.

## B. Penalty Phase

### 1. Aggravating Evidence

#### a. Victim Impact Evidence

Seak Ang Hor, Henry Song's widow, talked about her husband's life and described how his murder had affected her. Hor and Song had been married for about 30 years and had five children. The family emigrated to the United States in 1981 to escape conflict in Cambodia. At the time of the murder, Song had owned the Sean Hong Jewelry store for about four years. The family's entire life savings was invested in the business, and they had no insurance. Hor closed the jewelry store after her husband's murder.

Two of Song's adult children, David and Lilly, also testified. David described cleaning up the store after the murder. He also testified that everyone in the family now had to work harder to support their mother and youngest brother. Lilly, who had renewed her driver's license on the day of the murder, said that "every time I use my license, it reminds me . . . of the pain, that he was killed." She also had to drop out of college because she could not concentrate.

7

### b. Prior Criminal Activity

The prosecution introduced evidence of defendant's prior criminal activity involving the use of force. (§ 190.3, factor (b).) On September 8, 1992, defendant and several accomplices broke into a home in Kennewick, Washington, and robbed the inhabitants at gunpoint. Defendant was convicted of first degree robbery and sentenced to 55 months in prison in Washington State. However, he escaped from custody on February 28, 1996.

Defendant's girlfriend S. K., with whom defendant lived during the 1996 Fresno robberies, testified that he was violent and abusive.

On September 5, 1996, Fresno police pulled over a vehicle in which defendant was a passenger. A handgun was found inside the car. The vehicle's driver testified that an Asian man carrying a gun had offered him money for a ride and that as the police pulled them over, the Asian man offered him more money to say that the gun was his. However, the driver could not say for sure whether that man was defendant.

On January 17, 1997, Ty K., the brother of defendant's girlfriend, called the police because defendant was acting in a drunk and belligerent manner. Police arrested defendant for unauthorized possession of a firearm, possession of a controlled substance, and vandalism.

When awaiting trial for the charged crimes, defendant was detained at the Fresno County Jail. On March 9, 1997, a correctional officer told defendant that he was being placed in isolation due to a fight with another inmate. Defendant became hostile and told the officer, "I see you all the time on the streets, I'll remember you." On May 15, 1997, another correctional officer found among defendant's possessions a piece of metal she described as a "shank."

### c. *Prior Felony Convictions*

The prosecution introduced conviction records showing that defendant had 1992 and 1993 Oregon felony convictions for unauthorized use of a vehicle as well as a 1993 Washington State conviction for first degree armed robbery. (§ 190.3, factor (c).)

### 2. *Mitigating Evidence*

Defendant testified on his own behalf. He was born in Laos, but his family was forced to flee the country after the Communists came to power because his father and brother had fought alongside the United States Army. The family resettled in a refugee camp in Thailand. Defendant's family was poor, and he received no formal education. He was conscripted into the Thai army for five years. Aside from his stint in the army, defendant lived in the refugee camp until he came to the United States in 1987. When in prison for a prior offense, defendant referred himself to a chemical dependency program.

In his penalty phase closing argument, defendant's counsel emphasized his client's difficult upbringing, his confession and expressions of remorse, and his drug addiction, as well as guilt phase testimony suggesting that defendant shot Song in the course of a struggle for defendant's gun.

### 3. *Sentencing*

Before announcing its sentencing decisions, the trial court indicated it had considered, in mitigation, both defendants' difficult backgrounds; defendant's drug addiction and his "request for help with chemical dependence"; his confession and expressions of remorse; and the evidence that he may have "perceived necessity and self-defense" in shooting Song due to the store owner's resistance.

In aggravation, the trial court found that all of the alleged crimes of violence and the prior felony convictions had been proved beyond a reasonable doubt. The court observed that "defendant has shown a long pattern of violent crime against many, many victims." The court cited defendant's criminal history; the violence he exhibited in the charged offenses, including the killing of Henry Song; and defendant's conduct in custody since his arrest.

The trial court concluded that "[r]egarding Mr. Sivongxxay, as unpleasant as it is, I find the death sentence to be justified and appropriate."

## II. DISCUSSION

In his appeal, defendant challenges the validity of his jury waiver and the trial court's consideration of certain evidence at the penalty phase. He also raises several challenges to the constitutionality of the death penalty.

### A. Guilt Phase

As previously discussed, the guilt and penalty phases of defendant's trial proceeded before a court sitting without a jury. Defendant asserts that he did not enter a valid waiver of his right to a jury trial, in derogation of his rights under the state and federal Constitutions and state statutory law.

#### 1. *Waiver of a Jury Trial*

Both defendant and Mounsaveng were present at the pretrial waiver hearing and were represented by counsel. The colloquy proceeded as follows:

"THE COURT: Okay. Oday Mounsaveng and Vaene Sivongxxay.

"MS. DETJEN: Jennifer Detjen, appearing for the People.

"MR. PETILLA: Rudy Petilla, for Mr. Sivongxxay.

"MR. KINNEY: Ernest Kinney, present in court, for Tony Vong [an alias of Oday Mounsaveng].

10

"THE COURT: This matter is currently set for trial. What do we have, the 11th?

"MS. DETJEN: That's good.

"THE COURT: January 11th. Status of the case?

"MR. KINNEY: Your Honor, I believe we're ready to proceed on the 11th. I've talked with cocounsel and the DA, and for a variety of reasons — we're prepared to go. We're prepared to — waive a jury trial and have a judge trial in this death penalty case.

"MR. PETILLA: That's correct, Your Honor, and I have, of course — would acknowledge that this particular court would still be hearing the case.

"THE COURT: Yes, it's been assigned to me for all purposes. Ms. Detjen, People's position?

"MS. DETJEN: People are ready to waive a jury trial in this case.

"THE COURT: All right. And I think the record should show — since this is a capital case — that, and the record is void of any in-chambers' [*sic*] discussions on this. We haven't had any.

"MS. DETJEN: That's correct.

"MR. PETILLA: Yes.

"MR. KINNEY: That's correct.

"THE COURT: Mr. Mounsaveng, Mr. Sivongxxay, you each have a right to a trial, either by a jury of 12 people selected from this community, through a process that you would engage in with your attorneys, the district attorney and the Court, or a trial in front of a judge, acting alone without a jury. [¶] The burden of proof remains the same. The district attorney has the burden to go forth with evidence sufficient to prove your guilt beyond a reasonable doubt. Then, and only then, would we get to a penalty phase.

11

[¶]  In a court trial, I would hear the evidence.  I, alone, would make the decision on whether that evidence was sufficient to prove your guilt beyond a reasonable doubt.  [¶]  In the event I made such a finding, as to either or both of you, we would then proceed to a penalty phase, where the district attorney would present aggravation evidence.  Through your — you, through your attorney, would have a right to present mitigation evidence, and it would fall upon me to make the decision as to the appropriate punishment, which could result in a death penalty sentence.  [¶]  Do you give up your right to a jury trial and agree that this Court, alone, will make those decisions, Mr. Mounsaveng?

"THE DEFENDANT MOUNSAVENG:  Yes.

"THE COURT:  Mr. Sivongxxay?

"THE DEFENDANT SIVONGXXAY:  Yes.

"THE COURT:  Ms. Detjen?

"MS. DETJEN:  Yes, Your Honor, the People waive the jury trial.

"THE COURT:  All right.  We'll show a jury waiver on all issues, confirm the matter for January the 11th.  We'll notify the jury commissioner that they do not need to send out any summonses, and we will start with the pretrial matters on that day. . . ."

There was no further discussion of jury waiver throughout the remainder of the trial proceedings.

Under the federal Constitution and our state Constitution, a defendant in a criminal prosecution has a right to a jury trial.  (U.S. Const., amend. VI; Cal. Const., art. I, § 16; *People v. Weaver* (2012) 53 Cal.4th 1056, 1071 (*Weaver*).)  However, a "jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel."  (Cal. Const., art. I, § 16.)  Waiver must be "express[ed] in words . . . and will not be

12

implied from a defendant's conduct." (*People v. Holmes* (1960) 54 Cal.2d 442, 443-444 (*Holmes*).) Moreover, "a defendant's waiver of the right to jury trial may not be accepted by the court unless it is knowing and intelligent, that is, ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it,' " ' as well as voluntary ' " 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' " ' " (*People v. Collins* (2001) 26 Cal.4th 297, 305 (*Collins*), quoting *Moran v. Burbine* (1986) 475 U.S. 412.) "[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case." (*Adams v. U.S. ex rel. McCann* (1942) 317 U.S. 269, 278 (*Adams*).)

Defendant acknowledges that he expressly stated on the record that he gave up his right to a jury trial, and he makes no claim that his purported waiver was coerced or otherwise involuntary. Instead, he asserts that his decision to waive his jury trial right was not knowing and intelligent. Specifically, he contends that as a Laotian refugee with no formal education and limited command of the English language, he would not have understood what the right to trial by jury entailed unless the trial court or counsel explained it to him. Defendant points out that the trial court's waiver colloquy did not explain that a jury must be impartial, that its verdict must be unanimous, or that the trial court must declare a mistrial if the jury fails to reach a verdict. The trial court also did not ask any questions confirming that defendant understood how a jury works, or that defendant had discussed the jury waiver with his counsel.

Our precedent has not mandated any specific method for determining whether a defendant has made a knowing and intelligent waiver of a jury trial in favor of a bench trial. We instead examine the totality of the circumstances. (See *Adams*, *supra*, 317 U.S. at p. 278; cf. *People v. Marlow* (2004) 34 Cal.4th 131,

13

148 [looking to the "totality of the circumstances" in ascertaining whether a defendant knowingly and intelligently waived his rights in entering a guilty plea]; *People v. Howard* (1992) 1 Cal.4th 1132, 1175 (*Howard*) [same].)

Here, we conclude that defendant entered a knowing and intelligent jury waiver. Although defendant is a Laotian refugee with no formal education and limited English proficiency, he was represented by counsel and assisted by a translator throughout the trial. The defense initiated the request for a court trial. In response, the trial court advised defendant that he had a right to a jury trial, that a jury consists of 12 people from the community, that he would have the right to participate in the selection of the jury, and that waiver of the right to a jury would mean the judge alone would determine his guilt or innocence and any resulting punishment. After these advisements, defendant answered "Yes" when asked whether he wished to "give up [his] right to a jury trial and agree that this Court, alone, will make those decisions." The trial court then observed that the waiver applied to "all issues" at trial.[2] Additionally, defendant had prior experience with the criminal justice system, having pleaded guilty to two prior offenses in Oregon and one in Washington State. In 1993, in connection with his guilty plea in Washington, he signed a waiver stating that he "fully underst[ood]" his right to a jury trial. (See *Parke v. Raley* (1992) 506 U.S. 20, 37 ["evidence of a defendant's

---

[2]     Although the judge made this observation after defendant orally waived a jury trial, the totality of the circumstances approach permits a reviewing court to take into account events that follow the entry of a jury waiver to confirm matters such as the waiver's character and scope. (See, e.g., *U.S. v. Boynes* (4th Cir. 2008) 515 F.3d 284, 287; *U.S. v. Page* (5th Cir. 1981) 661 F.2d 1080, 1083; *State v. Clemons* (Kan. 2002) 45 P.3d 384, 393; *State v. Baxter* (Mo. 2006) 204 S.W.3d 650, 654.) Here, defendant's failure to express any surprise or confusion regarding the judge's assertion that the waiver applied to "all issues" represents a relevant consideration in ascertaining the nature and extent of his waiver.

prior experience with the criminal justice system [is] relevant to the question whether he knowingly waived constitutional rights"]); *People v. Langdon* (1959) 52 Cal.2d 425, 432 [observing, in ascertaining whether there had been a knowing and intelligent waiver of the jury trial right, that the defendant "had also been before the criminal courts on at least three previous occasions"]; *State v. Rizzo* (Conn. 2011) 31 A.3d 1094, 1112 (*Rizzo*) [considering a defendant's prior experience with the criminal justice system as relevant to whether the defendant entered a knowing and intelligent jury waiver]; *People v. Bannister* (Ill. 2008) 902 N.E.2d 571, 584 [same]; *Poore v. State* (Ind. 1997) 681 N.E.2d 204, 207 [same].) Viewed holistically, the circumstances surrounding defendant's jury waiver demonstrate that it was knowing and intelligent.

Defendant points out that the trial court did not mention that a jury must be impartial, and must also be unanimous in order to render a verdict. But "[t]he United States Supreme Court has never held that a defendant, when waiving the right to a jury, constitutionally is entitled to be canvassed by the trial court, let alone to require a specifically formulated canvass" (*Rizzo*, *supra*, 31 A.3d at p. 1116; see also *U.S. v. Cochran* (9th Cir. 1985) 770 F.2d 850, 851 (*Cochran*)),[3] and we have never insisted that a jury waiver colloquy invariably must discuss juror impartiality, the unanimity requirement, or both for an ensuing waiver to be knowing and intelligent. (See *People v. Tijerina* (1969) 1 Cal.3d 41, 45-46 [finding a jury waiver knowing and intelligent even though the defendant was not advised of the unanimity requirement].) It is true that in many cases in which we have upheld a waiver of a jury trial, we have observed that the defendant had been

---

**3**      Our *state* Constitution, of course, requires as a minimum that a jury waiver be "expressed in open court by the defendant and the defendant's counsel." (Cal. Const., art. I, § 16; see *People v. Ernst* (1994) 8 Cal.4th 441, 445.)

15

expressly advised that unanimity among the 12 jurors is necessary to render a guilt or penalty verdict. (See *People v. Cunningham* (2015) 61 Cal.4th 609, 636; *People v. Scott* (1997) 15 Cal.4th 1188, 1208 (*Scott*); *People v. Diaz* (1992) 3 Cal.4th 495, 570 (*Diaz*); *People v. Robertson* (1989) 48 Cal.3d 18, 37, fn. 5 (*Robertson*).) But under the totality of the circumstances standard, the presence or absence of a reference in a colloquy to this particular attribute of a jury trial, or to the impartiality requirement, is not necessarily determinative of whether a waiver meets constitutional standards. (See *Weaver*, *supra*, 53 Cal.4th at pp. 1072-1074 [rejecting a defendant's argument that the failure to advise him of his right to participate in jury selection necessarily rendered his jury waiver invalid]; *U.S. v. DeRobertis* (7th Cir.1983) 715 F.2d 1174, 1186 [finding a knowing and intelligent jury waiver notwithstanding the trial court's failure to advise the defendant of the juror vote necessary to convict]; *Rizzo*, *supra*, 31 A.3d at p. 1118 ["this court and others have rejected claims that an otherwise valid waiver of the right to a jury is undermined by the trial court's failure to include a specific item of information in its canvass"].) With the circumstances presented here, we are not persuaded that the trial court's failure to mention these characteristics of a jury trial renders defendant's waiver constitutionally infirm.

At the same time, we use this opportunity to emphasize the value of a robust oral colloquy in evincing a knowing, intelligent, and voluntary waiver of a jury trial. Although our case law has eschewed any rigid formula or particular form of words that a trial court must use in taking a jury waiver, we observe that many other courts have offered guidance regarding important components of the waiver colloquy. (See, e.g., *U.S. v. Delgado* (7th Cir. 1981) 635 F.2d 889, 890 [trial courts "should explain that a jury is composed of twelve members of the community, that the defendant may participate in the selection of jurors, and that the verdict of the jury is unanimous. The court should inform the defendant that if

16

he waives a jury, the judge alone will decide guilt or innocence"]; *U.S. v. Robertson* (10th Cir. 1995) 45 F.3d 1423, 1432 [same]; *Marone v. U.S.* (2d Cir. 1993) 10 F.3d 65, 68 [same]; *U.S. v. Martin* (6th Cir. 1983) 704 F.2d 267, 274-275 [same]; *State v. Blann* (N.J. 2014) 90 A.3d 1253, 1253 [same]; *State v. Redden* (W.Va. 1997) 487 S.E.2d 318, 326 [adopting the same advisements and also suggesting that a trial court should "ascertain on the record whether improper pressure or inducements, or a confused mental state, have affected the defendant's decision to waive the right to a jury trial"]; *U.S. v. Duarte-Higareda* (9th Cir. 1997) 113 F.3d 1000, 1002 (*Duarte-Higareda*) [stating that the district court should advise a defendant of these factors and "question the defendant to ascertain whether the defendant understands the benefits and burdens of a jury trial and freely chooses to waive a jury"]; *State v. Anderson* (Wis. 2002) 638 N.W.2d 301, 310 [adopting similar advisements and also stating that a trial court must ensure that the defendant "made a deliberate choice, absent threats or promises, to proceed without a jury trial" and "had enough time to discuss this decision with his or her attorney"].)

Consistent with these decisions, we offer some general guidance to help ensure that a defendant's jury trial waiver is knowing and intelligent, and to facilitate the resolution of a challenge to a jury waiver on appeal. Going forward, we recommend that trial courts advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence. We also recommend that the trial judge take additional steps as appropriate to ensure, on the record, that the defendant comprehends what the jury trial right entails.

17

A trial judge may do so in any number of ways — among them, by asking whether the defendant had an adequate opportunity to discuss the decision with his or her attorney, by asking whether counsel explained to the defendant the fundamental differences between a jury trial and a bench trial, or by asking the defendant directly if he or she understands or has any questions about the right being waived. Ultimately, a court must consider the defendant's individual circumstances and exercise judgment in deciding how best to ensure that a particular defendant who purports to waive a jury trial does so knowingly and intelligently.

This guidance, of course, pertains only to waiver of a jury trial in favor of a bench trial. Furthermore, we emphasize that our guidance is not intended to limit trial courts to a narrow or rigid colloquy. We agree with the Connecticut Supreme Court that ultimately, a " 'defendant's rights are not protected only by adhering to a predetermined ritualistic form of making the record. Matters of reality, and not mere ritual, should be controlling.' " (*Rizzo*, *supra*, 31 A.3d at p. 1120.) Accordingly, the guidance above is advisory. As reflected in our determination here that defendant entered a knowing and intelligent waiver of his right to a jury trial, a trial court's adaptation of or departure from the recommended colloquy in an individual case will not necessarily render an ensuing jury waiver invalid. (See *U.S. v. Rodriguez* (7th Cir. 1989) 888 F.2d 519, 527 [describing the advisements prescribed in *U.S. v. Delgado*, *supra*, 635 F.2d 889, as "called for as a matter of prudence," and observing that "[l]esser (even no) warnings do not call into question the sufficiency of the waiver so far as the Constitution is concerned"]; *Cochran*, *supra*, 770 F.2d at p. 851.) Reviewing courts must continue to consider

all relevant circumstances in determining whether a jury trial waiver was knowing, intelligent, and voluntary.**4**

### 2. *Jury Waiver for the Special Circumstance Allegation*

Defendant also contends that he did not validly waive his right to a jury trial with respect to the special circumstance allegation. He observes that "the trial court made no mention of the special circumstance determination or the right to a jury trial thereon," and that defense counsel never stated on the record that he had discussed the special circumstance determination with his client. Defendant asserts that he therefore cannot be found to have entered a separate waiver of a jury trial for this allegation, as is required under *People v. Memro* (1985) 38 Cal.3d 658, 700-704 (*Memro*), and that his general jury waiver cannot be understood as incorporating a knowing and intelligent surrender of his right to a jury trial concerning the allegation.

Defendant's argument merges what are in fact two separate questions: whether his jury waiver was knowing and intelligent regarding the special circumstance allegation, and thereby met *constitutional* standards; and whether *state law statutory* error occurred under *Memro*, due to a failure to satisfy that decision's requirement for complying with certain provisions of the Penal Code. We find that there was a knowing and intelligent waiver regarding the special circumstance allegation, but agree with defendant that there was error under *Memro*. On the record before us, however, this error was harmless.

---

**4** Given the importance of this issue, we note that the Judicial Council of California may choose to refer the question to its criminal law committee to study and propose measures to assist trial courts in ensuring the validity of jury trial waivers.

19

*a. Adequacy of the Jury Waiver for the Special Circumstance*
*Allegation Under the Federal and State Constitutions*

A defendant who has been convicted of first degree murder is eligible for the death penalty only if the prosecution has charged, and the trier of fact has found true, one or more statutorily enumerated special-circumstance allegations. (§ 190.2, subd. (a).)  "Whenever special circumstances . . . are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance." (§ 190.4, subd. (a).)  With the exception of a prior-murder special-circumstance allegation (§ 190.2, subd. (a)(2)), which requires a separate proceeding, "[i]f the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged . . . ." (§ 190.1, subd. (a).)

Defendant asserts that there was no knowing and intelligent waiver of his right to a jury trial concerning the robbery-murder special circumstance alleged against him.  He does not argue that he was unaware of the special circumstance, or that he did not appreciate that he could receive the death penalty if it were found true.  Rather, he emphasizes that the trial court never explicitly told him that he had a right to a jury trial for the special circumstance allegation.  Defendant argues that this omission, viewed in the context of the record as a whole, means that he cannot be understood to have entered a valid waiver of his right to a jury trial for this allegation.

Defendant demands more than the federal and state Constitutions require for a valid waiver of the jury trial right.  As discussed, a knowing and intelligent jury waiver requires an appreciation of the *nature* of the jury trial right and the *consequences* of forgoing this right.  (*Collins*, *supra*, 26 Cal.4th at p. 305.)  There is no additional constitutional requirement that a defendant be specifically advised

20

of the specific charges, enhancements, allegations, or other issues to which a general jury waiver will apply.  On the contrary, with a comprehensive jury waiver such as the one entered below, absent unusual circumstances not present here " '[i]t is settled that where a defendant waives a jury trial he is deemed to have consented to a trial of all of the issues in the case before the court sitting without a jury.' " (*People v. Berutko* (1969) 71 Cal.2d 84, 94 (*Berutko*), quoting *People v. Russell* (1961) 195 Cal.App.2d 529, 532; see also *People v. Jarmon* (1992) 2 Cal.App.4th 1345, 1354-1355;[5] see generally 6 LaFave et al., Criminal Procedure (4th ed. 2015) § 22.1(h), p. 48 ["A jury waiver generally waives the right to a jury determination of all of the elements of an offense, including facts that authorize a higher sentencing range, treated as elements under the Court's *Apprendi* line of cases"] and cases cited.)[6]  Under this prevailing rule, our earlier determination that

---

[5]      As will be explained *post*, *Memro* construed two statutes as demanding more specificity than is constitutionally required for a jury waiver concerning a special circumstance allegation.  *Memro* distinguished the general rule, as stated in *Berutko*, as inapposite as a matter of statutory construction.  (*Memro*, *supra*, 38 Cal.3d at p. 702, fn. 52.)  But the added precision demanded as a matter of *state statutory law* under *Memro* does not mean that in order to satisfy the *constitutional* standard of a knowing, voluntary, and intelligent waiver of a jury trial for a special circumstance allegation, a jury waiver colloquy must expressly reference the allegation.

[6]      The relevant section of the LaFave treatise further provides: "When a jury trial of guilt and enhancements are separated, a defendant convicted by jury at the earlier phase should have an opportunity to waive a jury for the enhancement phase."  (6 LaFave, *supra*, § 22.1(h), p. 48.)  In this case, of course, there is no issue presented with regard to whether a defendant who has invoked a jury trial as to guilt or innocence may waive a jury with regard to a charged special-circumstance allegation.

Furthermore, the applicable California statutes provide for a separate trial of a special-circumstance allegation only when a prior murder special circumstance is charged (§ 190.1, subd.(b)); a separate trial is not provided for any other special-circumstance allegation, including a robbery-murder

*(Footnote continued on next page.)*

21

defendant's general waiver of a jury trial was knowing and intelligent is sufficient in itself to defeat defendant's contention that his waiver did not meet constitutional standards with regard to the special circumstance allegation.[7]

*(Footnote continued from previous page.)*

special-circumstance allegation as involved in this case. (§ 190.1, subd. (a).) Even in an instance in which a defendant who has waived a jury as to guilt or innocence chooses to invoke the right to a jury with regard to such a special-circumstance allegation ― a circumstance that, albeit theoretically possible, to our knowledge has not ever occurred in practice― the trial of the special-circumstance allegation need not be separated from the guilt trial.  In such a case, after the presentation of the relevant evidence before the court and the jury concurrently in a single trial, the jury can be required to return a verdict on the special-circumstance allegation in the event the trial court finds the defendant guilty of the charged murder offense.

[7]     The general rule recognized in *Berutko* presents no conflict with the results reached in *State v. Schofield* (Me. 2005) 895 A.2d 927 (*Schofield*) and *State v. Williams* (Or.Ct.App. 2005) 104 P.3d 1151 (*Williams*), where courts construed previously entered jury waivers as limited to charged crimes, and *not* as extending to the adjudication of additional facts that served to lengthen the defendants' sentences — facts that, due to the state of the law at the time the defendants entered their jury waivers, neither they nor their counsel had reason to believe were triable by a jury.

       The defendants in both *Schofield*, *supra*, 895 A.2d 927, and *Williams*, *supra*, 104 P.3d 1151, waived their right to a jury trial for criminal charges, were convicted, and then were sentenced to extended terms of imprisonment premised in part on additional findings made by the trial courts.  (*Schofield*, at pp. 929-930; *Williams*, at p. 1152.)  After the United States Supreme Court issued its decision in *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*), the defendants challenged their respective sentences on the ground that the judicial fact finding that had occurred deprived them of their Sixth Amendment right to a jury trial.  In *Williams*, the state responded that the defendant's waiver of a jury trial for the underlying charge necessarily implied a waiver of his right to a jury trial concerning the enhancement; a similar argument was advanced in *Schofield*. (*Schofield*, at pp. 930-931; *Williams*, at p. 1152.)

       Each court rejected the state's position.  *Williams*, *supra*, 104 P.3d 1151, emphasized that "[a]t the time that defendant opted for a court trial, he not only was unaware that he had a right to a jury determination of facts used to impose a

*(Footnote continued on next page.)*

Defendant's argument would fail even if we were to assume that — contrary to the conventional rule — a constitutionally sufficient general jury waiver does not necessarily incorporate a knowing and intelligent waiver of a jury trial for a special circumstance allegation in a capital case. Here, the specific advisements the trial court provided to defendant before taking his waiver, together with the other surrounding circumstances, confirm that defendant knowingly and intelligently relinquished his right to a jury trial for this allegation.[8]

*(Footnote continued from previous page.)*

dangerous offender sentence, but he also did not know of the possibility of such a sentence." (*Id*., at p. 1153.) *Schofield*, *supra*, 895 A.2d 927, determined that "[b]ecause Schofield, prior to *Blakely*, did not know that she had a right to have a jury determine, beyond a reasonable doubt, any facts necessary to increase her sentence beyond twenty years . . . her waiver extends only to the findings necessary to determine her guilt or innocence to the charge of manslaughter. It does not extend to findings that would serve to double the maximum sentence she faced upon conviction." (*Id*., at p. 931.)

Assuming, without deciding, that *Schofield*, *supra*, 895 A.2d 927, and *Williams*, *supra*, 104 P.3d 1151, correctly construed the effects of the defendants' jury waivers, both cases are distinguishable. Unlike the situation in *Williams*, here defendant most certainly was aware of the possibility he would receive a death sentence. Furthermore, both *Schofield* and *Williams* involved an intervening change in the law. In those cases defendants lacked (or were reasonably believed to lack, under the law prior to *Blakely*) a legal right to a jury trial for an enhancement or statutory aggravating findings when they entered their respective jury waivers. The *Schofield* and *Williams* courts thus declined to construe the defendants' jury waivers as forgoing a right to a jury trial that had not been recognized at the time the waivers were entered. By contrast, because defendant, who was represented by counsel at all pertinent times, had a right to a jury trial with regard to the special circumstance allegation at the time he entered his jury waiver (see § 190.4, subd. (a)), his comprehensive waiver is properly understood as subsuming that right. And in any event, as discussed *post*, the trial court's colloquy with defendant further demonstrates that defendant entered a knowing and intelligent waiver of a jury trial for the special circumstance allegation.

[8] The dissenting justices direct their attacks on perceived deficiencies in the judge's advisements to defendant, and fail to properly account for other facts that

*(Footnote continued on next page.)*

To review, after each defendant, through counsel, stated his desire to waive jury trial, the trial judge explained to defendant that he had "a right to a trial, either by a jury . . . or a trial by a judge." The judge described the trial as incorporating two phases. In the first phase, the judge explained, the district attorney bore the burden of introducing evidence sufficient to prove guilt beyond a reasonable doubt, and "[t]hen, and only then, would we get to a penalty phase." The judge also explained that in a court trial he alone "would make the decision on whether that evidence was sufficient to prove [defendant's] guilt beyond a reasonable doubt," and "In the event [he] made such a finding," the case would proceed to a penalty phase, at which time it would "fall upon [the judge] to make the decision as to the appropriate punishment, which could result in a death penalty sentence." The ultimate question posed to defendant was "Do you give up your right to a jury trial and agree that this Court, alone, will make those decisions . . . ?" After defendant answered in the affirmative, the trial court observed that the waiver applied to "all issues" in the trial.

Viewed together with all other relevant circumstances, this colloquy demonstrates beyond any dispute that defendant's waiver incorporated a knowing

_____

*(Footnote continued from previous page.)*

also connote a knowing and intelligent waiver. But "[a] waiver colloquy is a procedural device; it is not a constitutional end or a constitutional 'right.' " (*Commonwealth v. Mallory* (Pa. 2008) 941 A.2d 686, 697 (*Mallory*).) Thus, in various contexts in which we have been called upon to ascertain whether a waiver of constitutional rights was knowing and intelligent, we have not focused myopically on the waiver colloquy in isolation, but instead have conducted a more comprehensive assessment of the totality of the circumstances. (See, e.g., *People v. Mosby* (2004) 33 Cal.4th 353, 361; *Howard*, *supra*, 1 Cal.4th at pp. 1175-1178.) As we have discussed, here the relevant circumstances include not only the colloquy, but also defendant's prior criminal history, other events before and after the waiver was entered, and the fact that defendant was represented by counsel.

and intelligent declination of a jury trial for the special circumstance allegation. The trial court's advisement conveyed that defendant had a right to a jury trial with regard to all issues as to which an adverse determination could expose him to the death penalty — which included the special circumstance allegation — and that with his waiver, defendant would be giving up that right. Defendant's ensuing assent to a bench trial therefore manifested a knowing and intelligent waiver of his jury trial right with regard to the special circumstance allegation.

Our finding of a knowing and intelligent waiver of a jury trial for the special circumstance allegation finds support in our decision in *Diaz*, *supra*, 3 Cal.4th 495. There, in taking the defendant's waiver of a jury trial, the trial court informed the defendant, " '[Y]ou'll be giving up that right to have the jury in two different functions. First of all, first function is to decide the question of your guilt or innocence. Then the second function, similarly, assuming there are 12 of them and they would unanimously agree that you were guilty, then you would have 12 jurors who must unanimously agree as to the punishment. [¶] They have a choice, life without the possibility of parole or death. . . . And you'll be giving up that right.' " The defendant answered, " 'I'm giving it up.' " The court then asked the defendant if he understood that his waiver applied to " 'both phases . . . of the special circumstances case.' " The defendant assented. (*Id.*, at p. 564.) The defendant also told the court that he had discussed the matter " 'quite thoroughly' " with his attorney. (*Id.*, at p. 565.)

*Diaz*, *supra*, 3 Cal.4th 495, rejected the defendant's argument that his waiver was invalid, ruling instead that "the trial court explained to defendant that the waiver of his right to trial by jury applied to *all* aspects of his special circumstances case, from beginning to end. . . . Although the trial court's admonition was not a model of clarity, we believe it was sufficient to advise defendant that his waiver, which included all aspects of guilt and penalty, included

25

within it a waiver of the right to jury trial on the truth or falsity of the special circumstance allegation." (*Id.*, at p. 565.) *Diaz* reached this conclusion even though the trial court never explained to the defendant what a "special circumstance" was, and indeed, used the term "special circumstance" only in describing the *type of case* that was involved. The defendant in *Diaz* was never told by the judge that this "special circumstance" represented a specific allegation as to which he had a distinct jury trial right. Yet the court in *Diaz* nevertheless found a valid jury waiver concerning the special circumstance allegation. Given similar facts, the same reasoning applies here. Although the court below never used the phrase "special circumstance" in its colloquy with defendant, its advisement communicated to defendant that his waiver of a jury trial, if entered, would encompass the determinations that could make him subject to the death penalty as part of a described trial process. Defendant's resulting jury waiver was therefore knowing and intelligent with regard to the special circumstance allegation.

The dissenting justices apparently read the trial judge's advisements differently, perceiving the failure to expressly refer to the special circumstance allegation as somehow implicitly *excluding* that allegation from a counseled and otherwise comprehensive jury waiver. (See conc. & dis. opn. of Liu, J., *post*, at pp. 5-10; conc. & dis. opn. of Cuéllar, J., *post*, at pp. 6-8.) We respectfully disagree with this interpretation of the colloquy, for the reasons we have previously given.[9] The dissenting justices' position boils down to the proposition

---

[9] The dissenting justices' misreading of the colloquy saturates the remainder of their analysis, causing it to go astray in numerous respects.

For example, the error informs Justice Cuéllar's inapt analogy of this matter to two out-of-state decisions involving deficient penalty-phase waivers in capital trials. (Conc. & dis. opn. of Cuéllar, J., *post*, at pp. 9-11.) In one of these

*(Footnote continued on next page.)*

26

that the judge was constitutionally bound to utter the phrase "special circumstance" at some point in the waiver colloquy with defendant, even if the judge never went on to explain what this phrase meant. But our waiver jurisprudence rejects the notion that a knowing and intelligent waiver hinges on the recitation of a " 'talismanic phrase.' " (*Howard*, *supra*, 1 Cal.4th at p. 1180, quoting *U.S. v. Sherman* (9th Cir. 1973) 474 F.2d 303, 306.) The fact of the matter is that the dissenting justices, like defendant, would require a degree of elaboration and specificity in a jury waiver colloquy that has never been demanded for a jury waiver to be considered knowing and intelligent under constitutional standards.

### b. *Statutory Issues with Jury Waiver /* Memro *Error*

Defendant's related attack on his jury waiver, as it pertains to the special circumstance allegation, involves our decision in *Memro*.

*Memro*, *supra*, 38 Cal.3d 658, reconciled the provisions of sections 190.1, subdivision (a) and 190.4, subdivision (a). The former provides, in pertinent part, that in the trial of a capital case, "The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged." (§ 190.1, subd. (a).) This provision suggests that the same trier of fact will determine

---

*(Footnote continued from previous page.)*

decisions, the judge entered a jury waiver for *both* phases of a capital trial, even though the record suggested that the defendant sought to waive a jury for the guilt phase only. (*People v. Brown* (Ill. 1996) 661 N.E.2d 287, 297.) In the other, *Commonwealth v. O'Donnell* (Pa. 1999) 740 A.2d 198, the defendant "never personally waived her right to have a jury determine the penalty." (*Id*., at p. 211.) The discussions of jury waivers in both *Brown* and *O'Donnell* must be read in light of these distinguishing facts.

27

guilt and the truth of any special circumstance allegations.  The relevant text within the latter provision states, however, that "[i]f the defendant was convicted by the court sitting without a jury, the trier of fact [on the special circumstance allegation(s)] shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court."  (§ 190.4, subd. (a).)  *Memro* construed these statutes (as enacted by the Legislature in 1977, see Stats. 1977, ch. 316, §§ 7, 12, pp. 1257, 1261), read together, as requiring a "separate, personal waiver" of the right to a jury for a special circumstance allegation, above and beyond the standard guilt phase and penalty phase waiver.  (*Memro*, at p. 704.)

We have since clarified that the "separate waiver" required under *Memro* does not require a second enunciated waiver by the defendant.  In *Diaz*, this court's first case applying *Memro*, we explained that under *Memro*, "[t]he waiver must be made by the defendant personally, and must be 'separate' — that is, if the defendant is to be deemed to have waived the right to jury trial on both guilt and special circumstances, the record must show that the defendant is aware that the waiver applies to each of these aspects of trial."  (*Diaz*, 3 Cal.4th at p. 565.)  Because the defendant in *Diaz* "told the court that he had discussed the matter 'quite thoroughly' with his counsel," and the trial court's colloquy "explained to defendant that the waiver of his right to trial by jury applied to *all* aspects of his special circumstances case, from beginning to end," *Diaz* held that *Memro* was satisfied.  (*Diaz*, at p. 565.)

The *Memro* rule was construed similarly in *People v. Wrest* (1992) 3 Cal.4th 1088 (*Wrest*).  There, the defendant engaged in an on-the-record colloquy with the prosecutor.  In this colloquy, the prosecutor mentioned the terms "special circumstances" or "special allegations" several times, ultimately asking the defendant, " 'In other words, you don't want a jury trial on the issue of guilt or the special circumstances or the enhancements, right?' " to which the defendant

28

answered, " 'Yes.' " (*Id.*, at pp. 1103-1104, italics omitted.) *Wrest* found that the record reflected an "express and personal understanding and waiver of [the defendant's] right to a jury trial on the special circumstance allegations," observing that "[t]he mere fact that the prosecutor's questions combined issues of guilt, special circumstances, and enhancements did not vitiate the waiver." (*Id.*, at p. 1104.) In finding no error under *Memro*, *Wrest* disapproved three Court of Appeal decisions[10] to the extent that they might have been read to require a specific procedure for complying with *Memro*. (*Wrest*, at pp. 1104-1105.) *Wrest* explained that *Memro* does not demand "that a defendant's waiver of his jury-trial right on special circumstance allegations be taken in accordance with a prescribed ritual, e.g., a separate interrogation of defendant about his special circumstance jury trial rights as distinct from his other jury trial rights. . . . [*Memro*] simply requires that a valid waiver of the jury-trial right on a special circumstance actually cover the special circumstance. It does *not* require such a waiver to be taken in accordance with any particular procedure." (*Wrest*, at p. 1105; see also *Weaver*, *supra*, 53 Cal.4th at pp. 1074-1075; *Scott*, *supra*, 15 Cal.4th at p. 1208.)

The Attorney General urges us to construe the waiver colloquy here as sufficient under *Memro*. The Attorney General's argument finds some support in our statement in *Wrest*, *supra*, 3 Cal.4th 1088, that *Memro* "simply requires that a valid waiver of the jury-trial right on a special circumstance actually cover the special circumstance." (*Wrest*, at p. 1105.) Arguably, our conclusion that the trial court secured a constitutionally adequate waiver of a jury trial concerning the

---

[10]     Specifically, *Wrest* disapproved *People v. Moreno* (1991) 228 Cal.App.3d 564, 571-572, *People v. Gastile* (1988) 205 Cal.App.3d 1376, 1380-1381, and *People v. Sandoval* (1987) 188 Cal.App.3d 1428, 1431. (*Wrest*, *supra*, 3 Cal.4th at pp. 1104-1105.)

29

special circumstance allegation could be equated with a determination that defendant's waiver covered the charge, in the sense that it encompassed a knowing and intelligent waiver of a jury trial for the allegation. We nevertheless conclude the colloquy fell short of what the applicable statutes, as construed in *Memro*, require. There was no specific reference in the waiver colloquy to the need to adjudicate the special circumstance allegation; the term "special circumstance" was never mentioned at all. Although such precision is not required for a knowing, voluntary, and intelligent waiver, we believe that *Memro*'s requirement of a "separate waiver," even as that rule was subsequently clarified in *Diaz* and *Wrest*, demands at least that much specificity. Although we recognize that the line we draw is a narrow one, we hold that defendant's purported waiver as to the special circumstance determination was deficient, as a matter of state law, under *Memro*, *supra*, 38 Cal.3d 658.

Having identified *Memro* error, we now consider whether this error is amenable to harmless error review or instead requires automatic reversal.

States are free to apply their own harmless error rules to errors of state law. (*Cooper v. California* (1967) 386 U.S. 58, 62 ["when . . . state standards alone have been violated, the State is free . . . to apply its own state harmless-error rule to such errors of state law"].) The California Constitution imposes upon this court an obligation to conduct "an examination of the entire cause" and reverse a judgment below for error only upon determining that a "miscarriage of justice" has occurred. (Cal. Const., art. VI, § 13.) This provision informs the general rule in this state that to obtain reversal of the judgment based on a violation of a state statute, a defendant must demonstrate that it is "reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

30

Defendant argues that the *Watson* standard does not apply here, and that the error below should instead be regarded as structural, or reversible per se. We disagree. Categorization of an error as structural represents "the exception and not the rule." (*Rose v. Clark* (1986) 478 U.S. 570, 578; see also *People v. Marshall* (1996) 13 Cal.4th 799, 851 ["[t]here is a strong presumption any error" is susceptible to harmless error analysis].) In determining whether a federal constitutional error qualifies as structural, courts "ask whether the error rendered the *trial* 'fundamentally unfair or an unreliable vehicle for determining guilt or innocence' (*Neder* [*v. United States* (1999) 527 U.S. 1, 9]), or whether the effect of the error is 'necessarily unquantifiable and indeterminate' (*Sullivan* [*v. Louisiana* (1993) 508 U.S. 275, 282])." (*People v. Aranda* (2012) 55 Cal.4th 342, 366, italics omitted.) The fact that an error implicates important constitutional rights does not necessarily make it structural. "Many statutes . . . set out procedures designed to protect constitutional principles. Broadly construed, many of these procedural statutes may be said to protect due process and other constitutional safeguards. Nevertheless, most procedural shortcomings constitute trial error" and not structural error. (*People v. Anzalone* (2013) 56 Cal.4th 545, 555-556 (*Anzalone*).) The "miscarriage of justice" language within article VI, section 13 of the California Constitution likewise contemplates a limited class of structural errors, consisting of " '[t]he kinds of errors that, regardless of the evidence, may result in a "miscarriage of justice" because they operate to deny a criminal defendant the constitutionally required "orderly legal procedure" (or, in other words, a fair trial) — for example, the denial of the defendant's right to a jury trial or to an impartial trial judge [citation] — [and] all involve fundamental "structural defects" in the judicial proceedings . . . .' " (*People v. Alexander* (2010) 49 Cal.4th 846, 896.)

31

The mistake that occurred here is not such an error. At the outset, we observe that defendant has not directed our attention to any language in section 190.1, subdivision (a), in section 190.4, subdivision (a), or in any legislative or ballot materials relating to these statutes that indicate the Legislature (in enacting the 1977 versions of these statutes) or the electorate (in repealing and reenacting these statutes as part of a 1978 initiative (Prop. 7, §§ 3-4, 9-10, as approved by voters, Gen. Elec., Nov. 7, 1978)) saw a structural error as occurring when a trial court, in taking a knowing and intelligent waiver of the jury trial right, fails to explicitly reference the special circumstance allegation as encompassed within the waiver, or otherwise obtain a separate jury waiver for this allegation.**11**

---

**11** Justice Cuéllar extracts a rule of per se reversal from language within section 190.4, subdivision (a), providing that "the trier of fact [for a special circumstance allegation] shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court." He asserts that this phrasing connotes the Legislature's and electorate's intent that a deviation from the specified procedure amounts to a structural error. (Conc. & dis. opn. of Cuéllar, J., *post*, at pp. 20-21.)

But this text, which closely resembles the statutory phrasing involved in *Berutko*, *supra*, 71 Cal.2d at page 94, cannot reasonably be read in the manner suggested by Justice Cuéllar. The language conveys that a criminal defendant has a right to a jury trial regarding a special circumstance allegation; reading it together with the language in section 190.1, subdivision (a), the court in *Memro*, *supra*, 38 Cal.3d 658 also determined that it conveyed a right to a separate waiver. (*Id.*, at pp. 700-704.) It does not follow from the statutory language, however, that a deviation from the procedure recognized in *Memro* constitutes a structural error, and there is no indication whatsoever that the Legislature or electorate saw it as such.

Justice Cuéllar's opinion reaches its conclusion only by assuming that defendant could not have knowingly and intelligently waived a jury trial *as a matter of constitutional law* absent compliance with the specific separate waiver that *Memro* determined was required as matter of *statutory* law. The opinion thus improperly conflates state statutory procedures with constitutional standards, an approach that, as we shall discuss *post*, has been consistently rejected.

32

Nor does the analysis in *Memro* itself support treating the error here as structural. *Memro* determined that another error required reversal and a remand of the matter for additional proceedings. (*Memro*, *supra*, 38 Cal.3d at p. 704.) For this reason, *Memro* did not need to and did not determine the consequences of a judge's failure to elicit a sufficiently specific jury waiver for the trial of a special circumstance allegation. (*Id.*, at pp. 704-705.) Yet *Memro* never suggested that a failure to obtain such a waiver would fall into the rare class of mistakes that are reversible per se. And indeed, every Court of Appeal that has detected the type of error described in *Memro* has applied a form of harmless error analysis to the mistake, rather than finding it reversible per se. (*People v. Moreno*, *supra*, 228 Cal.App.3d at p. 579; *People v. Gastile*, *supra*, 205 Cal.App.3d at pp. 1383-1384; *People v. Granger* (1980) 105 Cal.App.3d 422, 428-429.)

The type of *Memro* error involved here is, in fact, quite different from those mistakes that are regarded as structural. This error did "not *necessarily* render [defendant's] criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." (*Neder v. United States*, *supra*, 527 U.S. at p. 9.) Nor are the effects of this lapse "necessarily unquantifiable and indeterminate." (*Sullivan v. Louisiana*, *supra*, 508 U.S. at p. 282.) On the contrary, we are more than capable of scrutinizing the record to ascertain whether it reveals a reasonable probability that defendant would have demanded a jury trial for the special circumstance allegation, had no *Memro* error occurred.

Defendant characterizes such an inquiry as unduly speculative. But we have conducted comparable evaluations of the record in other contexts, assessing whether a defendant would have made a different decision absent an error in advisement. For example, we have structured examinations of prejudice around whether a criminal defendant still would have entered a guilty or no contest plea had the judge provided an adequate advisement regarding the plea's immigration consequences (*People v.*

33

*Martinez* (2013) 57 Cal.4th 555, 559 (*Martinez*); *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 192 (*Zamudio*)); whether a defendant would have accepted a plea bargain offered by the prosecution had his or her attorney provided effective assistance of counsel (*In re Alvernaz* (1992) 2 Cal.4th 924, 937); and whether an unrepresented defendant would have invoked the right to counsel had he or she been readvised of this right upon arraignment after the preliminary examination, as is required under section 987, subdivision (a) (*People v. Crayton* (2002) 28 Cal.4th 346, 365 (*Crayton*)).

*Martinez*, *supra*, 57 Cal.4th 555, is instructive concerning the nature of this type of review. Previously, we had determined in *Zamudio*, *supra*, 23 Cal.4th 183, that where a trial court fails to supply the advisement required under section 1016.5 regarding the immigration consequences of a guilty or no contest plea and the defendant shows that his or her conviction may result in adverse immigration consequences, the court, on the defendant's motion, must vacate the judgment and allow the defendant to withdraw the plea — provided, however, the defendant also could show prejudice by establishing that "it was reasonably probable he or she would not have pleaded guilty if properly advised." (*Martinez*, at p. 559, citing *Zamudio*, at p. 210.) *Martinez* considered "whether a court ruling on a motion to vacate pursuant to section 1016.5 may deny relief, for lack of prejudice, if it concludes the defendant would not have obtained a more favorable outcome had he or she chosen not to plead guilty or nolo contendere." (*Martinez*, at p. 559.) It determined that "because the question is *what the defendant would have done*, relief should be granted if the court, after considering evidence offered by the parties relevant to that question, determines the defendant would have chosen not to plead guilty or nolo contendere, even if the court also finds it not reasonably probable the defendant would thereby have obtained a more favorable outcome." (*Ibid.*)

This approach recognizes that a defendant may accept or reject a plea for what might objectively appear to be unreasonable motives, which must be respected as reflections of the defendant's autonomy.  Nevertheless, as befits an error under state statutory law alone, review occurs under the "reasonably probable" standard of *Watson*, *supra*, 46 Cal.2d at page 836, and the defendant bears the burden of showing that he or she would have acted differently had the error not occurred.  (*Martinez*, *supra*, 57 Cal.4th at p. 562.)  This assignment of the burden can be important, as it was in *People v. McClellan* (1993) 6 Cal.4th 367.  *McClellan* considered a trial court's failure to advise the defendant that his guilty plea would make him subject to registration as a sex offender under section 290.  (*McClellan*, at p. 372.)  On appeal, the defendant in *McClellan* argued that the error automatically entitled him to withdraw from the plea agreement.  (*Id*., at p. 374.)  Although this court agreed with the defendant that an error occurred under state law (*id*., at p. 376), it disagreed regarding the resulting remedy.  *McClellan* concluded that the defendant bore the burden of showing he would have made a different decision with a proper advisement, and determined that he had not met that burden: "Although defendant alleges that had he been properly advised, he would not have entered his plea of guilty, there is nothing in the record on appeal to support this contention.  Thus, we conclude defendant has failed to meet his burden of establishing prejudice." (*Id*., at p. 378.)

Our decisions in cases such as *Martinez* and *McClellan* manifest the viability of the form of harmless error analysis that applies here.  Similarly pertinent is *People v. Sanchez* (1995) 12 Cal.4th 1,[12] where this court evaluated whether a defendant was prejudiced by an error in advisement by considering whether the defendant still would

---

[12]    *People v. Sanchez*, *supra*, 12 Cal.4th 1, was disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22.

have waived a jury trial absent the mistake. The defendant in *Sanchez* received a death sentence after he waived a jury trial for the guilt phase of a capital case, opting instead for the court to decide guilt on the basis of preliminary hearing transcripts. (*Id.*, at pp. 17, 23-27.) On appeal, the defendant argued that the trial court committed prejudicial error because in taking the defendant's waiver of a jury trial for the guilt phase, it failed to comply with a state law requirement that the defendant be advised of the potential maximum and minimum terms of imprisonment. (*Id.*, at p. 30; see *People v. Dakin* (1988) 200 Cal.App.3d 1026, 1033.) Applying the *Watson* "reasonably probable" standard of review to this omission, *Sanchez* found insufficient indicia of prejudice. (*Sanchez*, at p. 30.) The defendant knew that he faced a possible death sentence if convicted, it was noted. (*Ibid.*) Furthermore, *Sanchez* observed, "It is clear from the record that defendant would have waived his right to a jury trial and insisted on the submission of the guilt phase on the preliminary hearing transcripts even if he was specifically told by the court that he faced a possible death sentence." (*Id.*, at p. 31.)

Other courts also consider themselves capable of ascertaining whether a defendant would have chosen a jury trial over a bench trial if there had not been an error by the judge or counsel in connection with the jury waiver. In *U.S. v. Williams* (7th Cir. 2009) 559 F.3d 607, for example, faced with a jury waiver that did not comply with the requirements of rule 23(a) of the Federal Rules of Criminal Procedure (18 U.S.C.) the court declined to characterize the error as structural. It instead ascertained that "for purposes of determining whether the waiver *was*, in fact, invalid, one can determine whether the defendant adequately understood his right to a jury; moreover, if the defendant lacked such an understanding, one can assess the likelihood that he would have stood on his right to a jury had he been properly admonished of his right." (*U.S. v. Williams*, at p. 614.) Later, the court in *U.S. v. Williams* reiterated that, having failed to raise a timely objection to the allegedly

inadequate waiver procedure, the defendant "must show that he did not have a concrete understanding of his right to a jury and that it is reasonably probable that he would not have waived a jury had he had such an understanding." (*Id*., at p. 616.)

A similar inquiry has also been endorsed for ascertaining whether a defendant suffered prejudice due to ineffective assistance of counsel in connection with a jury waiver. In *State v. Keller* (Iowa 2009) 760 N.W.2d 451, for example, the defendant's written jury waiver did not discuss any of the specific elements of the jury trial right, and there was no record of any waiver colloquy between the trial court and the defendant. (*Id.,* at p. 452.) The defendant in *Keller* pressed an ineffective assistance of counsel claim, asserting that her counsel provided constitutionally inadequate assistance by not ensuring a knowing and adequate waiver. (*Ibid*.) In describing the defendant's burden of showing prejudice, the *Keller* court explained that she "must prove by a preponderance of the evidence that, but for counsel's failure to assure compliance with the rule, she would not have waived her right to a jury trial." (*Id.*, at p. 453.) In Illinois, prejudice from the deficient performance of counsel in connection with a jury waiver is assessed by reference to "whether there exists a reasonable likelihood that the defendant would not have waived his jury right in the absence of the alleged error." (*People v. Maxwell* (Ill. 1992) 592 N.E.2d 960, 973.) And in *Mallory*, *supra*, 941 A.2d 686, the Pennsylvania Supreme Court rejected the petitioner's argument that counsel's alleged ineffective assistance in connection with a jury waiver amounted to structural error. *Mallory* concluded instead that "to prove trial counsel ineffective . . . . appellant must show that his understanding of the written [jury] waiver was constitutionally impaired by his lawyer's deficient performance, as well as proof that he would have elected a jury but for his lawyer's performance." (*Id.*, at p. 702; see also *Taylor v. Horn* (3d Cir. 2007) 504 F.3d 416, 450 [observing that a habeas corpus petitioner had not shown that he was prejudiced

by the denial of his jury trial right because he "never asserted that he would have elected [a jury], had he known of the option"].)[13]

The purpose of this discussion of relevant authority is not to suggest that all of these cases are factually on all fours with the present matter. It merely establishes that, contrary to defendant's position that such an inquiry is hopelessly speculative, in appropriate circumstances courts can indeed ascertain whether or not a particular defendant would have chosen a jury trial instead of a bench trial had an error in advisement not occurred.

Of course, there are limits to the ability of courts to undertake this form of analysis. These limits are suggested by our decision in *Collins*, *supra*, 26 Cal.4th 297. There, in taking the defendant's jury waiver, the judge advised him that he would receive "some benefit" by forgoing a jury trial. (*Id*., at p. 302.) *Collins* regarded this inducement as violating the defendant's federal constitutional rights, because it meant that his ensuing waiver of a jury trial could not be understood as voluntary. (*Id*., at pp. 309, 311.) This error, *Collins* determined, was structural, in the same manner as the outright refusal to provide any jury trial would be. (*Id*., at p. 312.)

---

[13] In another case decided the same year as *Mallory*, the Pennsylvania Supreme Court applied a similar mode of analysis in addressing a jury waiver issue presented on direct appeal. In *Commonwealth v. Houck* (Pa. 2008) 948 A.2d 780, the defendant claimed to have been misled by the trial court's misadvisement regarding the range of sentences that could adhere upon conviction. (*Id*., at pp. 785-786.) The court was "persuaded that the voluntariness of a jury waiver can be undermined where the defendant is informed of a range of potential sentences at a jury waiver colloquy that is less than the sentence eventually imposed." (*Id*., at p. 788.) The court also determined, however, "that if a defendant seeks to invalidate an otherwise valid jury waiver based on a trial court's recitation of his or her potential sentence, the defendant should be required to demonstrate that his or her understanding of the length of the potential sentence was a material factor in making the decision to waive a jury trial." (*Ibid*.)

38

The situation here is different from that before the *Collins* court in two important respects. First, the statutory error that arises under state law when a trial court fails to meet *Memro*'s prophylactic requirement does not necessarily warrant the same treatment that a constitutional error would receive. Our precedent, and that of other jurisdictions, has recognized a difference between a failure to comply with a statutory requirement that may serve to protect a constitutional right, and a violation of the underlying constitutional right itself. In *Anzalone*, *supra*, 56 Cal.4th at page 555, for example, we explained that the statutory requirement that a court or clerk ask a jury whether it has agreed upon a verdict in a criminal case (§ 1149) is "designed to protect the right to a unanimous verdict," a "core constitutional right." We nevertheless held that a failure to comply with this statute was subject to harmless error analysis under the standard specified in *Watson*, *supra*, 46 Cal.2d at page 836. (*Anzalone*, at pp. 555, 560.) Likewise, in *Crayton*, *supra*, 28 Cal.4th at page 364, we identified the requirement that an unrepresented defendant be readvised of his or her right to counsel upon being arraigned on an information after a preliminary examination (§ 987, subd. (a)) as a "prophylactic safeguard" that protects the right to counsel. Yet we determined that a failure to readvise a defendant amounted to statutory error, not federal constitutional error, and reviewed the error for prejudice under the *Watson* standard. (*Crayton*, at pp. 365-366; see also *People v. Vera* (1997) 15 Cal.4th 269, 276, 278 [distinguishing between the forfeiture rules applicable to constitutional rights and those applicable to statutory rights].)[14]

---

[14]    Other jurisdictions recognize a similar distinction. Within the specific context of jury waivers, an abundant body of precedent distinguishes between a failure to comply with statutory rules, or other rules of procedure with the force of law, that prescribe how a jury waiver is to be taken; and a failure to obtain a knowing, intelligent, and voluntary jury waiver. (See, e.g., *U.S. v. Leja* (1st Cir. 2006) 448 F.3d 86, 93 [concluding that a jury waiver that does not comply with Federal Rule of Criminal Procedure 23(a) (18 U.S.C.) may nevertheless be valid];

*(Footnote continued on next page.)*

Second, even granting the existence of *Memro* error, defendant nonetheless personally entered a constitutionally adequate jury waiver, applicable to all phases of his trial.[15]  The presence of a personal jury waiver that met basic constitutional standards, if not the heightened requirements recognized as a matter of statutory construction in *Memro*, minimizes any speculation that would otherwise be associated with ascertaining whether defendant would have chosen a jury trial for the special circumstance allegation, but for the *Memro* error.  The presence of a knowing, intelligent, and voluntary *personal* waiver of a jury trial by defendant distinguishes the facts of this case from those involved in *People v. Blackburn* (2015) 61 Cal.4th 1113 (*Blackburn*) and *People v. Tran* (2015) 61 Cal.4th 1160, in which errors of state law were treated as structural.  In *Blackburn*, this court classified as reversible per se a failure to obtain any personal jury waiver *at all* from a defendant in a civil commitment proceeding.  (*Id.*, at pp. 1133-1134.)  *Tran* similarly cast as structural error the absence of a personal jury waiver from a defendant prior to proceedings to extend his involuntary commitment after pleading not guilty by reason of insanity to a

---

*(Footnote continued from previous page.)*

*U.S. v. Robertson*, *supra*, 45 F.3d at p. 1431 [same]; *State v. Feregrino* (Iowa 2008) 756 N.W.2d 700, 707-708 [ruling that a failure to comply with a state rule of criminal procedure providing that a jury waiver must be in writing and on the record, does not, by itself, constitute structural error]; *State v. Redden*, *supra*, 487 S.E.2d at p. 327 [determining that a failure to comply with a state law requirement of a written jury waiver does not, by itself, invalidate a defendant's jury waiver]; *People v. Mosly* (Mich.Ct.App. 2003) 672 N.W.2d 897, 901 [concluding that a failure to comply with Michigan statutory law in connection with a jury waiver does not require reversal if the "defendant nonetheless understood that he had a right to a trial by jury and voluntarily chose to waive that right"].)

[15]     As we discuss *post*, defendant entered a knowing and intelligent jury waiver as to the penalty phase, as he did for all other components of his trial.

criminal offense. (*Tran*, at p. 1163.) In those decisions, this court's view of the absence of a personal jury waiver in commitment proceedings as a structural error found support in prior decisions treating a comparable absence of a personal jury waiver in a criminal proceeding as a structural defect. (*People v. Ernst*, *supra*, 8 Cal.4th at pp. 444-449; *Holmes*, *supra*, 54 Cal.2d at pp. 443-444; see Cal. Const., art. I, § 16.)

Here, in contrast, defendant personally entered a jury waiver, meaning that we are not left to "speculate about whether [defendant] would have chosen a jury trial if he . . . had been in a position to make a personal choice." (*Blackburn*, *supra*, 61 Cal.4th at p. 1134.) Under somewhat analogous circumstances, *Blackburn* itself contemplated the application of harmless error analysis. The *Blackburn* majority observed that "a trial court's failure to properly advise [a] . . . defendant of the right to a jury trial does not by itself warrant automatic reversal. Instead, a trial court's acceptance of a defendant's personal waiver without an express advisement may be deemed harmless if the record affirmatively shows, based on the totality of the circumstances, that the defendant's waiver was knowing and voluntary." (*Id.*, at p. 1136.)

The distinctive facts involved here also render inapposite decisions from other jurisdictions that defendant cites for the proposition that a failure to obtain a valid jury waiver requires automatic reversal. In *Fortune v. U.S.* (D.C. 2009) 59 A.3d 949, 955 (*Fortune*) the trial court failed to take *any* waiver of a jury trial from the defendant before proceeding to a bench trial of a charged crime — an error of constitutional dimensions.[16] Other cases that defendant relies upon, meanwhile, either did not

---

[16] The dissenting justices regard *Fortune*, *supra*, 59 A.3d 949, as being on point. (Conc. & dis. opn. of Liu, J., *post*, at pp. 15-16; conc. & dis. opn. of Cuéllar, J., *post*, at p. 15.) This position, however, follows from their incorrect

*(Footnote continued on next page.)*

41

involve a personal jury waiver by the defendant (e.g., *State v. Hauk* (Wis.Ct.App. 2002) 652 N.W.2d 393, 403-404) or addressed a perceived failure to secure a knowing and intelligent waiver of the right to a jury trial (e.g., *Duarte-Higareda*, *supra*, 113 F.3d at p. 1003) — errors that, as we have explained, differ from the one involved here in their magnitude and their susceptibility to harmless error analysis.

Nor does *State v. Little* (Minn. 2014) 851 N.W.2d 878 (*Little*) support defendant's position that the mistake here defies harmless error analysis. In *Little*, the prosecution added a new charge *after* defendant entered a jury waiver. (*Id.*, at p. 881.) The *Little* court concluded that the earlier waiver did not necessarily encompass the later-added charge. (*Id.*, at p. 883.)[17] The court nevertheless *conducted harmless error review* and found the error prejudicial. (*Id.*, at p. 886.) In finding prejudice, the

<hr>

*(Footnote continued from previous page.)*

assertion that there was no knowing and intelligent jury waiver with regard to the special circumstance allegation in this case. There was such a waiver, and we perceive a significant difference between a failure to obtain *any* jury waiver at all, and a jury waiver that, although knowing and intelligent, does not satisfy the heightened standards described in *Memro*. Furthermore, *Fortune* cannot reasonably be read as taking the position that violation of a statutory procedure associated with the taking of a waiver is necessarily structural error — a position that, as discussed, this court has repeatedly rejected in any event. (See, e.g., *Anzalone*, *supra*, 56 Cal.4th at pp. 555-556; *Crayton*, *supra*, 28 Cal.4th at pp. 364-366.) The fact that the *Fortune* court appears to have considered a specific and grave error's inconsistency with a local statute as one of several factors relevant to a determination that the mistake was structural in nature (*Fortune*, at pp. 956-957) does not, logically, support the conclusion that *any* violation of *any* statutory procedure that protects a substantive right is necessarily structural error.

17      In reaching this conclusion, the court in *Little*, *supra*, 851 N.W.2d 878, observed that entering a jury waiver, " '[a]ll that [a] defendant waive[s] [is] a jury trial of the issues then formed, and not of any and all other issues that might possibly be thereafter formed under amended pleadings, and which he could not anticipate.' " (*Id.*, at p. 883.) This principle is not pertinent to this case.

42

court emphasized that although the conduct underlying the new charge was the same as that involved with previously charged crimes for which defendant had entered a jury waiver, "the elements to be proved and the penalties are dramatically different." (*Id.*, at pp. 885-886.) Thus, whereas *Little* involved *no* waiver with regard to an added charge that significantly upped the ante of the defendant's trial, here defendant entered a constitutionally adequate jury waiver applicable to all phases of his trial. The cases therefore diverge in both the magnitude of the errors involved, and the ability of a reviewing court to evaluate what a defendant would likely have done in the absence of the error. Even so, *Little applied* harmless error analysis to the error before it. The fact that *Little* identified the error as prejudicial due to uncertainty about *that* defendant's choice between a jury trial and a bench trial does not support the wholesale rejection of harmless error analysis in this context.

Similarly distinguishable is *Miller v. Dormire* (8th Cir. 2002) 310 F.3d 600, a federal habeas corpus case, in which a jury waiver was entered by the petitioner's counsel. (*Id.*, at pp. 601-602.) The petitioner testified at an evidentiary hearing that his attorney never explained the right to a jury trial to him, and "that he would have insisted upon a jury trial had he known he had the right to make such a decision." (*Id.*, at p. 602.) The prosecution argued that the petitioner could not show prejudice because he could not establish that a jury would have reached a verdict different from the one that resulted from the petitioner's bench trial. (*Id.*, at p. 604.) The court determined that the attorney's complete failure to counsel his client regarding a jury trial constituted ineffective assistance under the Sixth Amendment to the United States Constitution, and "presumed" that prejudice resulted from this "structural" error. (*Miller*, at p. 604.) Thus, *Miller* also involved constitutional error, not statutory error under state law, the petitioner had made a showing of prejudice, and the court's characterization of the error before it as structural connoted its rejection of a form of harmless error analysis that we do not endorse here. Significantly, after *Miller* was

43

decided, that same federal appellate circuit rejected another federal habeas corpus petitioner's claim of ineffective assistance of counsel in connection with a jury waiver on the ground that the petitioner had "not established that he would have insisted on a jury trial in any event." (*Nelson v. Hvass* (8th Cir. 2004) 392 F.3d 320, 324.)

We therefore conclude that at least where, as here, a defendant has personally entered a knowing, intelligent, and voluntary jury waiver as to all aspects of his or her trial, *Memro* error admits of harmless error analysis. This assessment entails a review of the record to ascertain whether it reveals a reasonable probability that defendant would have opted for a jury trial of the special circumstance allegation, had no *Memro* error occurred. In undertaking this inquiry, we consider "what the defendant would have done" (*Martinez*, *supra*, 57 Cal.4th at p. 558, italics omitted), not what we believe he should have done (*id.*, at p. 562, italics omitted). As we explain, on this record we conclude that defendant has not shown that there is a reasonable probability that, had the trial judge expressly referenced the special circumstance allegation in the waiver colloquy or otherwise sought a separate waiver regarding the allegation, defendant would have refused to enter such a waiver, and instead would have sought a jury trial for this aspect of his case. (See *Watson*, *supra*, 46 Cal.2d at p. 836.)

Defendant personally entered what we have determined to be a knowing and intelligent jury trial waiver, and did so with the assistance of counsel. The record reveals no hesitation by defendant in entering the waiver, nor uncertainty or confusion about its scope or consequences, even when the trial judge advised him that it applied "to all issues" in the case. Nor does the record reflect any concern or objection by defendant when the attorneys offered argument to the court concerning the relationship of the evidence adduced at trial to the special circumstance allegation — first in connection with section 1118 motions, and again in the parties' closing statements — or when the court found the special circumstance allegation to be true. Finally, to the degree such evidence is useful in ascertaining what defendant would

have done (see *Martinez*, *supra*, 57 Cal.4th at p. 564), we perceive nothing in the nature of the allegations or the proof at trial that suggests a basis for seeking a decision maker for the special circumstance allegation different from the one who would decide the charged crimes and penalty. The proof of the special circumstance allegation was overwhelming, and overlapped with the evidence establishing defendant's guilt of felony murder.

In conclusion, because the record before this court on appeal provides no basis for concluding that defendant would have chosen a jury trial for the special circumstance allegation had the trial judge avoided *Memro* error, we find the error harmless under the *Watson* standard.

## B. Penalty Phase Issues

### 1. Penalty Phase Jury Waiver Issues

Defendant also asserts that his waiver of a jury trial for the penalty phase was invalid or incomplete. His argument is twofold. First, he renews his argument concerning the absence of a knowing and intelligent jury waiver, stressing that the trial judge failed to adequately apprise him of essential features of the penalty phase. Additionally, relying on *People v. Hovarter* (2008) 44 Cal.4th 983 (*Hovarter*), defendant argues that the court was required to reaffirm at the outset of the penalty phase any jury waiver entered prior to trial. These arguments lack merit.

#### a. Adequacy of the Jury Waiver for the Penalty Phase Under the Federal and State Constitutions

Defendant's argument that he did not enter a knowing and intelligent waiver as to the penalty phase is not well taken.

As previously related, the trial court's advisement explained to defendant that he had a right to a trial by jury, and discussed two "decisions" that would be made by the court if this right were waived. First, the court would make "the

45

decision on whether [the] evidence was sufficient to prove . . . guilt beyond a reasonable doubt." The court further explained that in the event it made such a finding, the case "would then proceed to a penalty phase" in which the district attorney would present aggravation evidence, defendant would have a right to present mitigation evidence, and it would fall on the court to make "the decision as to the appropriate punishment, which could result in a death penalty sentence." After this explanation, the court asked defendant, "Do you give up your right to a jury trial and agree that this Court, alone, will make *those decisions* . . . ?" (Italics added.) Defendant assented.

With the trial court's phrasing leaving no question that defendant's right to a jury trial extended to any penalty phase — at which time the court, if a jury was waived, would make the second "decision" — defendant principally critiques the colloquy on the ground that the trial court did not tell defendant prior to taking his jury waiver that a death sentence could only result from a unanimous jury verdict. (See § 190.4, subd. (b).)

Under the totality of the circumstances presented here, we do not believe that this omission, or any other attribute of the colloquy, directs a conclusion that defendant did not enter a knowing and intelligent waiver of a jury for the penalty phase. The better practice may be for a trial judge to provide such an advisement before taking a jury waiver. Yet a failure to do so does not rise to the level of a constitutional violation where, as in this case, the other circumstances surrounding a jury waiver adequately establish that it was knowing and intelligent.[18] Even

---

[18] As Justice Liu observes in the dissenting portion of his opinion (conc. & dis. opn. of Liu, J., *post*, at pp. 19-20), some courts have held that, as a prerequisite to taking a knowing and intelligent waiver of a jury trial in a capital case, a trial court must advise the defendant of juror unanimity rules pertinent to sentencing. (E.g., *State v. Martinez* (N.M. 2002) 43 P.3d 1042, 1048-1049.)

*(Footnote continued on next page.)*

though defendant was not told by the judge that a jury would have to unanimously agree on a death sentence for such a sentence to be imposed, he was advised of other elements of a jury trial and he was represented by counsel in connection with the jury waiver. These and other attendant circumstances suffice to defeat defendant's claim of constitutional error. (See *Weaver*, *supra*, 53 Cal.4th at pp. 1072-1074; *Robertson*, 48 Cal.3d at pp. 36-38 [rejecting a defendant's argument that the trial court's failure to advise him of the consequences of a jury deadlock at the penalty phase rendered his jury waiver invalid, and observing that "[a]bsent an assertion or evidence to the contrary, we presume that competent counsel would have informed defendant of the effect of a jury deadlock"]; *Sowell v. Bradshaw* (6th Cir. 2004) 372 F.3d 821, 834-836 [finding a constitutionally effective jury waiver notwithstanding a failure to advise the defendant that a jury's decision to recommend the death penalty had to be unanimous]; *State v. Foust* (Ohio 2006) 823 N.E.2d 836, 851-852 [finding a knowing and intelligent jury waiver in a

---

*(Footnote continued from previous page.)*

Other courts have rejected the argument that such an advisement is required as a matter of constitutional law, however. (E.g., *People v. Whitehead* (Ill. 1987) 508 N.E.2d 687, 697; *State v. Bays* (Ohio 1999) 716 N.E.2d 1126, 1135.) We consider the latter approach more consistent with the touchstone principles that whether a waiver is knowing and intelligent is to be ascertained by reference to the totality of the relevant circumstances, and that "the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances — even though the defendant may not know the *specific detailed* consequences of invoking it." (*United States v. Ruiz* (2002) 536 U.S. 622, 629 [discussing a waiver of rights attendant to the entry of a guilty plea].)

47

capital case even though the defendant was not advised that a jury's vote for a death sentence must be unanimous].)[19]

### b. *Failure to Reaffirm Defendant's Jury Waiver*

Defendant's other challenge to his jury waiver as it relates to the penalty phase faults the trial judge for failing to reaffirm the waiver at the outset of this phase. Defendant gleans the need for such a reaffirmation from our decision in *Hovarter*.

In *Hovarter*, *supra*, 44 Cal.4th 983, the first trial of a capital case resulted in a mistrial at the penalty phase when the jury was unable to reach a verdict. Upon retrial, the defendant waived his right to a jury, and the trial court returned a verdict of death. (*Id.*, at p. 989.) On appeal, the defendant argued that permitting him to waive a jury for the penalty phase retrial violated section 190.4, subdivision (b) as well as his constitutional rights. (*Hovarter*, at p. 1024.) Section 190.4, subdivision (b), provides, "If defendant was convicted by the court sitting without a jury[,] the trier of fact at the penalty hearing shall be a jury unless a jury is waived by the defendant and the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and the people. [¶] If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be. If such new jury is unable to reach a unanimous verdict as to what the penalty shall be, the court in its discretion shall

---

[19] Justice Liu also asserts that the colloquy misadvised defendant that he could not seek a bench trial for the guilt phase of trial, but a jury trial for the penalty phase of trial. (Conc. & dis. opn. of Liu, J., *post*, at pp. 22-23.) We do not believe that the colloquy is reasonably susceptible to this interpretation.

either order a new jury or impose a punishment of confinement in state prison for a term of life without the possibility of parole."

The defendant in *Hovarter* read the first sentence of the second paragraph of section 190.4, subdivision (b) as imposing upon the court a mandatory duty to empanel a new jury for a penalty phase retrial. (*Hovarter*, *supra*, 44 Cal.4th at p. 1025.) We disagreed with this interpretation, determining that "[b]ecause the default position in criminal cases is a trial by jury, with a jury trial waiver the exception, the first paragraph of section 190.4, subdivision (b) must be read to mean that, despite the fact an accused waived his right to a jury for the guilt phase, the trial court must presume the defendant wants a jury to try the penalty phase unless a jury is again waived. In other words, as an added protection for criminal defendants, a single jury trial waiver given early in the trial process is insufficient; a defendant must reaffirm his waiver for the penalty phase. This view of section 190.4, subdivision (b) explains why the first paragraph includes an explicit mention of waiver. [¶] The meaning of the second paragraph dovetails with the first: If a jury was not waived for the penalty phase of trial, it shall be presumed the defendant also desires a jury for any retrial of that phase. This presumption, however, can — as in all situations in which the jury trial right attaches — be overcome with a knowing and intelligent waiver, personally given in open court." (*Id.*, at pp. 1026-1027.)

Defendant construes our analysis in *Hovarter*, *supra*, 44 Cal.4th 983, as announcing a rule that the trial court must reaffirm the defendant's jury trial waiver at the outset of the penalty phase of all capital trials, regardless of whether an initial jury waiver entered prior to the guilt phase incorporated an adequate waiver of the jury trial right for the penalty phase. This view misreads *Hovarter*. There, our discussion of the inadequacy of "a single jury waiver given early in the trial process" presupposed a jury waiver *as to the guilt phase only*. (*Id.*, at

49

pp. 1026-1027.) When a pretrial jury waiver encompasses the penalty phase of a trial, as the waiver here did, there is no need for reaffirmation of the waiver as extending to the penalty phase before that later stage of trial proceedings.

The more relevant precedent here is *Diaz*, *supra*, 3 Cal.4th 495, which held that a pretrial waiver of the right to a jury trial sufficed to waive a jury trial on a special circumstance allegation and penalty determination where "the trial court explained to defendant that the waiver of his right to trial by jury applied to *all* aspects of [the defendant's] special circumstances case, from beginning to end." (*Id.*, at p. 565; see *id.*, at pp. 570-571.) Similarly, here the trial judge expressly distinguished between the guilt and penalty phases of a capital trial in his advisement prior to taking defendant's jury waiver, and asked defendant whether he agreed to waive his "right to a jury trial and agree that this Court, alone, will make *those decisions*." (Italics added.) The trial court's advisement was sufficient to make defendant "aware that the waiver applie[d] to each of these aspects of trial." (*Id.*, at p. 565.) No reaffirmation of the waiver before the start of the penalty phase was required in *Diaz*; nor was it here.

### 2. Consideration of Aggravating Evidence

Defendant contends the trial court erroneously considered three types of aggravating evidence at the penalty phase. He asserts these errors violated his rights under state law as well as the Eighth and Fourteenth Amendments to the federal Constitution, and that, considered individually or cumulatively, they require reversal.

### a. Prior Criminal Activity Involving Use of Force

At the penalty phase, the prosecution may present evidence showing "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or

violence." (§ 190.3, factor (b).) "The prosecution bears the burden of proving the factor (b) other crimes beyond a reasonable doubt." (*People v. Moore* (2011) 51 Cal.4th 1104, 1135.) As relevant here, the term "criminal activity" does not require that defendant was actually convicted. "However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence." (§ 190.3.) Moreover, "the term 'criminal activity' includes only conduct that violates a penal statute." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1133.) Yet "the proper admission of evidence under factor (b) is not based on the abstract, definitional nature of the offense, but on the conduct it involves." (*People v. Delgado* (2016) 2 Cal.5th 544, 583; see also *People v. Thomas* (2011) 52 Cal.4th 336, 363.)

"The question whether the acts occurred is . . . a factual matter . . . but the *characterization* of those acts as involving an express or implied use of force or violence, or the threat thereof, would be a legal matter properly decided by the court." (*People v. Nakahara* (2003) 30 Cal.4th 705, 720; see also *People v. Delgado*, *supra*, 2 Cal.5th at pp. 588-590.) Similarly, "whether the prosecution's proposed evidence in aggravation was an actual crime" is a legal question. (*People v. Taylor* (2010) 48 Cal.4th 574, 656.)

### i. Possession of Metal Object

First, defendant argues that the trial court erroneously considered evidence that he possessed a metal object while in jail. The prosecution contended that the item was a "dirk or dagger or sharp instrument" that defendant was prohibited from possessing while in confinement. (§ 4502, subd. (a).) Defendant argues, however, that the evidence introduced at the penalty phase failed to establish that

the item was sharp, and therefore his possession of the object should not have been considered in aggravation under section 190.3, factor (b).

As background, Terry Bardwell, a correctional officer at the Fresno County Jail, testified at the penalty phase that she inspected defendant's property upon his arrival at the jail. Officer Bardwell "found — we consider it contraband, which would be a shank. Umm, it was approximately five-and-a-half inches long and one inch in width." She wrote in her incident report that the object was made of metal. She discarded the object because it "was not of evidentiary value." On cross-examination, Bardwell conceded that she could not remember whether the object was sharpened, nor did she record anything in her report other than its size and material.

Defense counsel moved to strike Bardwell's testimony on the ground that there was insufficient evidence that the object had been sharpened to establish a violation of section 4502, subdivision (a). The trial court denied the motion, explaining, "I think it's admissible. It's contraband. It is contraband because it is an item that can be used as a weapon. So there's case law that says even if there's a reasonable inference that the item seized was in fact a tattoo needle and not a stabbing utensil, that it still is admissible as a weapon because it can be used as a weapon. Might have been a shoe horn, about five-and-a-half inches long, inch wide." Later, the trial court mentioned the shank when determining that a death sentence was justified, stating, "The incidents in jail following Mr. Sivongxxay's arrest have been considered: threats to correctional officers after discipline was meted out or explained; the presence of a shank, which under jail rules was a weapon, and as an inmate can be considered by the Court as including a threat of violence."

In asserting that the trial court erred in considering possession of the item among the circumstances in aggravation, defendant emphasizes that although

52

Officer Bardwell described the item as a "shank," she acknowledged on cross-examination that she could not recall if it was sharp. Under the circumstances, defendant argues, "this small piece of metal of unknown characteristics cannot qualify as a sharpened or stabbing instrument under section 4502 as a matter of law."

We need not decide whether the trial court erred in considering the evidence regarding the "shank" in aggravation, however, because even if we were to assume that defendant has correctly identified error, the mistake was harmless. Our determination whether state law error at the penalty phase prejudiced the defendant turns on whether "there is a reasonable (i.e., realistic) possibility that the [sentencer] would have rendered a different verdict had the error or errors not occurred." (*People v. Brown* (1988) 46 Cal.3d 432, 448.) " 'When evidence has been erroneously received at the penalty phase, this court should reverse the death sentence if it is "the sort of evidence that is likely to have a significant impact on the [sentencer's] evaluation of whether defendant should live or die." ' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 917.) Here, we have a clear indication of the sentencer's decisionmaking process because the trial court stated on the record the aggravating and mitigating evidence it considered in reaching its decision.

Defendant's "long pattern of violent crime against many, many victims" served as the organizing theme behind the trial court's summary of aggravating evidence. As the trial court put it, "[h]is life of victimization carried through from the first act of violence in Washington State until the ultimate death of Henry Song." Within that framework, defendant's postarrest conduct was an afterthought; it involved no acts of physical violence, and thus no victims, but only the threat of violence. The trial court's lack of emphasis on the metal object mirrors the prosecution's use of that evidence: It was only one of nine incidents introduced under section 190.3, factor (b), and it merited only a brief mention in

the prosecutor's penalty phase closing argument. To the extent the trial court placed any weight on defendant's conduct in custody and the future dangerousness it might have portended, the properly admitted evidence that defendant threatened a correctional officer, discussed *post*, conveyed that same theme. Thus, even assuming the trial court erred in considering evidence of the metal object, its error does not require reversal of the death sentence.

### ii. Statements to Correctional Officer

Defendant also challenges the admission of evidence under section 190.3, factor (b) that he threatened a correctional officer at the Fresno County Jail.

Eulalio Gomez, a correctional officer at the jail, testified that following an altercation between defendant and other inmates, defendant was moved to isolation. Officer Gomez was assigned the task of telling defendant that he was being removed from the general population and explaining the reasons why. Gomez testified that when he informed defendant that he was being placed in isolation, "[h]e became very hostile towards me. He began threatening me." Specifically, defendant said to him, " 'I see you all the time in the streets, I'll remember you,' " and he repeated that statement several times. Gomez explained that defendant "faced towards me, his hands clenched and very hostile, yelling at me and approximately three feet away from me." Gomez described this as a "combative stance, being a stance that would create an opinion or a belief that this person was going to attack you, assault you." However, defendant did not touch Gomez, nor did Gomez ask defendant what he meant by " 'I see you all the time in the streets, I'll remember you.' "

The prosecutor sought to admit this evidence under section 190.3, factor (b) "as a violation of section 69 of the Penal Code." Defense counsel objected, suggesting that defendant's comments represented a "communications problem"

54

rather than a threat. The trial court decided that it would "probably just hear [Gomez's testimony] and see whether it amounts to a threat in my mind." The trial court apparently concluded that the evidence was admissible because in explaining its decision to sentence defendant to death, it said it had considered as aggravating evidence "threats to correctional officers after discipline was meted out or explained."

On appeal, defendant contends that his conduct did not constitute criminal activity, and was therefore inadmissible, because it did not violate section 69. In relevant part, section 69 makes it a criminal offense to "attempt[], by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law." We have explained that a "threat, unaccompanied by any physical force, may support a conviction" under this part of section 69, but that to "avoid the risk of punishing protected First Amendment speech . . . the term 'threat' has been limited to mean a threat of unlawful violence used in an attempt to deter the officer." (*In re Manuel G.* (1997) 16 Cal.4th 806, 814-815.) "The central requirement . . . is an attempt to deter an executive officer from performing his or her duties imposed by law; unlawful violence, or a threat of unlawful violence, is merely the means by which the attempt is made." (*Id.*, at p. 815.) Accordingly, a violation of section 69 through a threat "requires a specific intent to interfere with the executive officer's performance of his duties." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1153 (*Gutierrez*).) "[A] present ability to carry out threats is not required if . . . the target of the threat could reasonably fear retaliatory action on some future occasion." (*People v. Hines* (1997) 15 Cal.4th 997, 1060 (*Hines*).)

In arguing that his conduct did not constitute a violation of section 69, defendant points to cases where the Attorney General declined to contest admissibility, where our observations about section 69 appeared in dicta, or that

are clearly distinguishable for other reasons.  (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1169-1170 [although "defendant verbally abused [correctional officer] and threatened to 'kick [his] ass,' " Attorney General declined to argue on appeal that this constituted a criminal threat]; *People v. Tuilaepa* (1992) 4 Cal.4th 569,  590 [noting defendant's reliance on the "general notion that abusive and even threatening language does not violate a penal statute"]; *People v. Pinholster* (1992) 1 Cal.4th 865, 961-962 [defendant's statement to sheriff in county jail that "if he were not sent to state prison he would 'go out on the streets and do something to get back in' " was "arguably inadmissible"], disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Silva* (1988) 45 Cal.3d 604, 636 [where defendant told officer that "he would kill the first police officer to step inside his cell if he was not permitted to visit with his wife," Attorney General conceded erroneous admission but argued it was harmless]; *People v. Coleman* (1988) 46 Cal.3d 749, 787-788 [though it was "not clear" that defendant's threat to correctional officer constituted criminal activity, defendant's claim was forfeited because he failed to object].)  Defendant fails to identify any case squarely holding that statements akin to those he made to Officer Gomez fall outside the scope of section 69.

As defendant recognizes, "threats must be placed and understood in their context."  (*People v. Iboa* (2012) 207 Cal.App.4th 111, 119.)  Here, the trial court could have reasonably inferred from defendant's comments that he sought to use a threat of future violence "to interfere with [Officer Gomez]'s performance of his duties" (*Gutierrez*, *supra*, 28 Cal.4th at p. 1153), namely, Gomez's task of telling defendant he had been reassigned to an isolation unit.  When Gomez explained that defendant was being moved to isolation, defendant repeatedly yelled the "I'll remember you" statement while standing three feet away from Gomez with his fists clenched in a "combative stance" that Gomez perceived as "very hostile."

56

Defendant thereby "underscored his words with action," and "[h]is conduct gave context to his threatening speech."  (*Iboa*, *supra*, at p. 120; see *ibid.* [concluding that defendant's "threatening statements, combined with his physical conduct of pacing, clenching his fists, showing off his gang tattoos, and aggressively approaching [a firefighter], constituted the type of threat of unlawful violence section 69 prohibits"]; see also *Hines*, *supra*, 15 Cal.4th at pp. 1059-1060 [where defendant told correctional officer attempting to restrain him that the officer "would be sorry [he] ever saw" him, "the jury could reasonably infer that the purpose of this threat was to prevent [the officer] from restraining defendant"].)  Accordingly, the trial court did not err in admitting and considering defendant's statements under section 190.3, factor (b) as a violation of section 69.

### b.  Escape from Custody

Defendant contends the trial court erred in considering his status as a prison escapee under section 190.3, factor (a), which allows the prosecution to present evidence regarding "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding."

In its opening statement and again in closing argument at the penalty phase, the prosecution noted that defendant escaped on February 26, 1996, from a Washington State prison where he was serving a 55-month sentence for first degree robbery.  Defendant had introduced evidence of the escape during the guilt phase in an attempt to rebut Mounsaveng's allegation that defendant threatened him in December 1995 and January 1996.  The prosecution invoked this evidence at the penalty phase to show that defendant began his Fresno crime spree "just five months after his escape from Washington State Prison, which demonstrates . . . Mr. Sivongxxay's lack of willingness to learn from his prior punishment, and shows his incarceration did not change his violent character."  The prosecutor's

penalty phase closing argument referenced *People v. Turner* (1990) 50 Cal.3d 668 and *People v. Johnson* (1992) 3 Cal.4th 1183 (*Johnson*), in which we held that evidence that a defendant had been released from felony incarceration shortly before the commission of charged crimes was admissible under section 190.3, factor (a). (*Turner*, at pp. 713-714; *Johnson*, at p. 1243 ["[t]hat defendant committed [the present] crimes only six days after his release from prison on a prior homicide conviction supports the inference that incarceration had failed to change his violent character. The jury could properly consider this inference in determining his sentence"].)

In announcing its sentencing decision, the trial court here said that although it was "not considering any circumstances of his escape itself," it had considered the fact that defendant committed the charged crimes "while he was on escape status as a previously convicted felon."

Defendant attacks the trial court's consideration of his escape status because, in his words, "[t]he walkaway was simply unrelated to the circumstances of the capital crime." We need not decide whether this is correct, or whether a sufficient connection existed between the escape and the circumstances of the capital crime here for evidence of defendant's status as an escapee to be considered under section 190.3, factor (a). Defendant failed to raise a timely objection to admission and consideration of this evidence. The claim is therefore forfeited. (*People v. Lewis* (2006) 39 Cal.4th 970, 1052; *Johnson*, *supra*, 3 Cal.4th at p. 1243.)[20]

---

[20] Defendant asserts that the prejudice from the multiple evidentiary errors he perceives to have occurred at the penalty phase must be assessed cumulatively. Since we have identified and assumed only one error as to which a claim on appeal has not been forfeited, and have concluded that the assumed error was harmless, no further review of prejudice is necessary.

### 3. Miscellaneous Challenges to the Death Penalty

Defendant raises numerous challenges to the constitutionality of the death penalty. He acknowledges that we have previously rejected each of these contentions. We do so again here, as detailed below.

Section 190.2 is not impermissibly vague, nor is it overbroad in a manner that fails to meaningfully narrow the class of murderers eligible for the death penalty. (*People v. Myles* (2012) 53 Cal.4th 1181, 1224-1225.)

Section 190.3, factor (a), which permits the sentencer to consider the "circumstances of the crime," is not impermissibly vague or overbroad. (*People v. Mills* (2010) 48 Cal.4th 158, 213 (*Mills*).)

Section 190.3, factor (b) does not violate the Fifth, Sixth, Eighth or Fourteenth Amendments to the federal Constitution in allowing the sentencer to consider previously unadjudicated criminal activity. (*People. v. Jones* (2013) 57 Cal.4th 899, 980.)

Section 190.3's use of the terms "extreme" and "substantial" does not erect unconstitutional barriers to the sentencer's consideration of mitigating evidence. (*People v. Valdez* (2012) 55 Cal.4th 82, 180 (*Valdez*).)

Section 190.3, factor (i) does not violate the Eighth or Fourteenth Amendments to the federal Constitution by permitting the sentencer to consider the defendant's age at the time of the crime. (*Mills*, *supra*, 48 Cal.4th at p. 214.)

Section 190.3, factor (k) is not unconstitutionally vague. (*Weaver*, *supra*, 53 Cal.4th at p. 1092.)

The relative culpability of codefendants is not a constitutionally required mitigating factor. (*People v. Maciel* (2013) 57 Cal.4th 482, 549.)

California's sentencing statute sets forth a constitutionally adequate burden of proof concerning the aggravating factors and the sentencer's ultimate decision. (*People v. Banks* (2014) 59 Cal.4th 1113, 1207 (*Banks*).)

The instructions and standards relevant to the sentencing decision are not impermissibly vague or ambiguous on any of the following grounds: CALJIC No. 8.88 uses the phrases "so substantial" and "warrants" (*Valdez*, *supra*, 55 Cal.4th at p. 180); CALJIC No. 8.88 fails to explain that the sentencer's ultimate determination is whether death is the appropriate penalty (*Valdez*, at p. 179); section 190.3 fails to guide the sentencer's discretion (*People v. Booker* (2011) 51 Cal.4th 141, 196); CALJIC No. 8.88 fails to state that life without possibility of parole is mandatory if the aggravating factors do not outweigh the mitigating factors (*People v. Gamache* (2010) 48 Cal.4th 347, 407); and the sentencer is not instructed to presume that life without possibility of parole is the appropriate sentence (*Valdez*, at p. 179).

The trial court was not required to make written findings before reaching its sentencing decision. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1097.)

Neither the Eighth Amendment nor the Fourteenth Amendment to the federal Constitution, nor international law, mandates the use of intercase proportionality review. (*Banks*, *supra*, 59 Cal.4th at p. 1207.) Nor does the California death penalty sentencing scheme violate equal protection for failing to provide certain procedural safeguards present in noncapital cases; as we have explained, "[t]he two groups of defendants are not similarly situated." (*People v. Johnson* (2016) 62 Cal.4th 600, 657.)

Finally, we once again reject the contention that California's use of the death penalty, at all or as actually implemented in this state, violates international law and the Eighth Amendment. (*People v. Johnson*, *supra*, 62 Cal.4th at p. 658.)

## III. CONCLUSION

We affirm the judgment in its entirety.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**KRUGER, J.**

**CONCURRING AND DISSENTING OPINION BY LIU, J.**

In California, not all first degree murders are punishable by death or by life imprisonment without the possibility of parole.  The gateway to these sanctions is the finding of a "special circumstance," a circumstance that sets the murder apart from other murders and makes it eligible for the law's most severe penalties. (Pen. Code, § 190.2; see *People v. Memro* (1985) 38 Cal.3d 658, 703 (*Memro*) [" 'The fact or set of facts to be found in regard to the special circumstance is no less crucial to the potential for deprivation of liberty on the part of the accused than are the elements of the underlying crime . . . .' "].)  The special circumstance allegation in this case was that the murder was committed during the commission of a robbery.  (Pen. Code, § 190.2, subd. (a)(17)(A); all undesignated statutory references are to this code.)

A criminal defendant is constitutionally entitled to a jury trial on the truth of a special circumstance allegation.  (See *Ring v. Arizona* (2002) 536 U.S. 584, 609; *People v. Prieto* (2003) 30 Cal.4th 226, 256–257.)  A defendant may waive a jury trial, but as a constitutional matter, a trial court may not accept a voluntary waiver "unless it is knowing and intelligent, that is, ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*People v. Collins* (2001) 26 Cal.4th 297, 305 (*Collins*); see *Moran v. Burbine* (1986) 475 U.S. 412.)  In addition, the Penal Code provides:  "The trier of fact shall make a special finding that each special

circumstance charged is either true or not true. . . . [¶] If the defendant was convicted by the court sitting without a jury, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court." (§ 190.4, subd. (a) (section 190.4(a)).) In *Memro*, we held that under section 190.4(a) "an accused whose special circumstance allegations are to be tried by a court must make a separate, personal waiver of the right to a jury trial." (*Memro*, *supra*, 38 Cal.3d at p. 704.) In this case, defendant Vaene Sivongxxay was denied a jury trial on the special circumstance allegation in violation of these constitutional and statutory guarantees. This unlawful denial of a jury trial is a structural error requiring automatic reversal.

Today's opinion concludes otherwise. The court reprints Sivongxxay's waiver colloquy in its entirety (maj. opn., *ante*, at pp. 10–12) and acknowledges that "[t]here was no specific reference in the waiver colloquy to the need to adjudicate the special circumstance allegation; the term 'special circumstance' was never mentioned at all" (*id.* at p. 30). Yet the court finds no constitutional violation, reasoning that Sivongxxay's assent to a jury trial waiver on "all issues" meant he understood he was waiving a jury trial on the special circumstance allegation. (*Id.* at p. 25.) This is a remarkably loose interpretation of what it means to make a "knowing and intelligent" waiver. (*Collins*, *supra*, 26 Cal.4th at p. 305.) How can it be said that Sivongxxay waived a jury trial on the special circumstance allegation " ' " 'with a *full awareness* both of the nature of the right being abandoned and the consequences of the decision to abandon it' " ' " (*ibid.*, italics added) when the special circumstance "was never mentioned at all" (maj. opn., *ante*, at p. 30) in the waiver colloquy?

Sivongxxay's waiver was also deficient under section 190.4(a) because he made no separate waiver of a jury trial on the special circumstance allegation. On this point, the court agrees; it concludes that the waiver colloquy lacked the

2

"precision" and "specificity" required by the statute. (Maj. opn., *ante*, at p. 30.) But the court goes on to find this error harmless on the ground that Sivongxxay has not shown a reasonable probability that he "would have chosen a jury trial for the special circumstance allegation had the trial judge avoided [the] error." (*Id.* at p. 45.) This latter holding may understandably cause a bit of whiplash: The court, having found error under the statute, excuses the error through reasoning that defeats the statute's very purpose.

Section 190.4(a) provides that even if a defendant waives a jury trial on other aspects of a capital case, the trier of fact on the special circumstance allegation "shall be a jury" unless the defendant executes a *separate* waiver. (§ 190.4(a); see *Memro*, *supra*, 38 Cal.3d at p. 704.) The Legislature, recognizing the gravity of a special circumstance allegation, expressly mandated a jury trial unless the defendant forgoes it specifically through a separate waiver. What is left of this requirement if, upon proof of a violation, the burden is on the defendant to show he would have wanted a jury trial had the trial court not violated the statute? Here, as in *People v. Blackburn* (2015) 61 Cal.4th 1113, 1131 (*Blackburn*) and *People v. Tran* (2015) 61 Cal.4th 1160, 1169 (*Tran*), "[t]he statute does not require the defendant to affirmatively show he or she wanted a jury trial; a jury trial is the default procedure absent a personal waiver." When a statute expressly guarantees a jury trial on a specific matter unless the defendant waives a jury trial on that matter, the deprivation of a jury trial without a waiver on that matter is a "miscarriage of justice" that requires automatic reversal. (Cal. Const., art. VI, § 13; see *Blackburn*, at p. 1136; *Tran*, at p. 1169.)

From today's opinion, one would not get the sense that the jury trial guarantees in federal and state law "reflect a fundamental decision about the exercise of official power — a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." (*Duncan v.*

3

*Louisiana* (1968) 391 U.S. 145, 156.) I would not have thought that such a fundamental right — what Justice Scalia called "the spinal column of American democracy" (*Neder v. United States* (1999) 527 U.S. 1, 30 (conc. & dis. opn. of Scalia, J.)) — could be so easily relinquished or, more accurately, wrested from a criminal defendant by the very institution whose potential for overreach the right is meant to protect against. "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. . . . Fear of unchecked power, so typical of our State and Federal Governments in other respects, found expression in the criminal law in this insistence upon community participation in the determination of guilt or innocence." (*Duncan*, at pp. 155–156.) Today's decision breaks faith with this constitutional judgment and undermines an important safeguard of California's death penalty scheme.

For these reasons, and because Sivongxxay's jury trial waiver as to the penalty phase was also invalid, I respectfully dissent from the court's affirmance of the special circumstance finding and the death judgment.

## I.

In addressing Sivongxxay's constitutional claim before his statutory claim, today's opinion inverts the usual order of analysis. (See, e.g., *People v. Brown* (2003) 31 Cal.4th 518, 534; *People v. Duarte* (2000) 24 Cal.4th 603, 610.) Perhaps this is because the court's overall approach to the jury trial waiver on the special circumstance allegation flows from its conviction that the waiver was knowing and intelligent. This conviction, however, finds no support in the law or the record before us.

The court cites *People v. Berutko* (1969) 71 Cal.2d 84 (*Berutko*) for the proposition that a defendant who " 'waives a jury trial . . . is deemed to have consented to a trial of all of the issues in the case before the court sitting without a

4

jury.' " (*Id.* at p. 94.)  Under *Berutko*, the court says, the finding that Sivongxxay's guilt phase waiver was "knowing and intelligent is sufficient in itself to defeat defendant's contention that his waiver did not meet constitutional standards with regard to the special circumstance allegation."  (Maj. opn., *ante*, at p. 22.)  But a glance at *Berutko* makes clear that this is a stretch.

Although the court implies that *Berutko* set forth a "general rule" of constitutional law (maj. opn., *ante*, at pp. 21–22, fns. 5, 7), that case did not address any constitutional issue concerning the jury trial waiver.  Instead, *Berutko* addressed the scope of a jury trial waiver in the context of a specific statute, former section 969 1/2 (now section 969.5), which provided that " 'the question whether or not [the defendant] has suffered such previous conviction must be tried by a jury impanelled for that purpose, unless a jury is waived, in which case it may be tried by the court.' " (*Berutko*, *supra*, 71 Cal.2d at p. 94.)  The statutory nature of *Berutko*'s holding was confirmed in *Memro*, where we found *Berutko* "inapposite" to interpreting section 190.4.  (*Memro*, *supra*, 38 Cal.3d at p. 702, fn. 52.)  *Berutko* never discussed whether the jury trial waiver in that case was knowing or intelligent as a constitutional matter.  (See *Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1134 [" ' "cases are not authority for propositions not considered" ' "].)  Indeed, *Berutko*'s entire analysis of the waiver issue consisted of just three sentences:  The first said, "This contention is without merit," and the other two quoted Court of Appeal opinions addressing jury trial waivers only in the context of prior conviction allegations.  (*Berutko*, at p. 94.)  *Berutko* is not authority for a "general rule" applicable to a special circumstance allegation in a capital trial.

The real heart of the court's analysis is its claim that "the specific advisements the trial court provided to defendant before taking his waiver, together with the other surrounding circumstances, confirm that defendant

5

knowingly and intelligently relinquished his right to a jury trial for this allegation." (Maj. opn., *ante*, at p. 23.) The court asserts: "The trial court's advisement conveyed that defendant had a right to a jury trial with regard to all issues as to which an adverse determination could expose him to the death penalty — *which included the special circumstance allegation* — and that with his waiver, defendant would be giving up that right." (*Id.* at p. 25, italics added.)

Let us compare this assertion, particularly the italicized phrase, with the waiver colloquy: "THE COURT: Mr. Mounsaveng, Mr. Sivongxxay, you each have a right to a trial, either by a jury of 12 people selected from this community, through a process that you would engage in with your attorneys, the district attorney and the Court, or a trial in front of a judge, acting alone without a jury. [¶] The burden of proof remains the same. The district attorney has the burden to go forth with evidence sufficient to prove your guilt beyond a reasonable doubt. Then, and only then, would we get to a penalty phase. [¶] In a court trial, I would hear the evidence. I, alone, would make the decision on whether that evidence was sufficient to prove your guilt beyond a reasonable doubt. [¶] In the event I made such a finding, as to either or both of you, we would then proceed to a penalty phase, where the district attorney would present aggravation evidence. Through your — you, through your attorney, would have a right to present mitigation evidence, and it would fall upon me to make the decision as to the appropriate punishment, which could result in a death penalty sentence. [¶] Do you give up your right to a jury trial and agree that this Court, alone, will make those decisions . . . ? [¶] . . . [¶] THE COURT: Mr. Sivongxxay? [¶] THE DEFENDANT SIVONGXXAY: Yes. [¶] THE COURT: Ms. Detjen? [¶] MS. DETJEN: Yes, Your Honor, the People waive the jury trial. [¶] THE COURT: All right. We'll show a jury waiver on all issues . . . ."

6

Today's opinion acknowledges, as it must, that "[t]here was no specific reference in the waiver colloquy to the need to adjudicate the special circumstance allegation; the term 'special circumstance' was never mentioned at all." (Maj. opn., *ante*, at p. 30.)  What, then, is the basis for the assertion that "[t]he trial court's advisement conveyed that defendant had a right to a jury trial with regard to all issues as to which an adverse determination could expose him to the death penalty — *which included the special circumstance allegation* — and that with his waiver, defendant would be giving up that right"? (*Id.* at p. 25, italics added.) Simply put, there is none.

The court relies on *People v. Diaz* (1992) 3 Cal.4th 495 (*Diaz*), but that case is easily distinguished. The colloquy in *Diaz* expressly mentioned the special circumstance. (*Id*. at p. 564 [trial judge asked Diaz whether he understood that his waiver applied to " 'both phases . . . of the special circumstanceS case' "].) Further, the record showed that Diaz told the court he had discussed the matter " 'quite thoroughly' " with his attorney. (*Id.* at p. 565.) The case before us does not involve "similar facts." (Maj. opn., *ante*, at p. 26.)

The court says that to distinguish *Diaz* from this case is to endorse "the proposition that the judge was constitutionally bound to utter the phrase 'special circumstance' at some point in the waiver colloquy with defendant." (Maj. opn., *ante*, at pp. 26–27.) I agree that a trial judge need not recite any " ' "talismanic phrase" ' " (*id.* at p. 27) when discussing a special circumstance jury waiver. But it is unusual, to say the least, to explain a thing without naming the thing being explained. This is especially true here in light of our recognition that the special circumstance is a "unique" feature of California's capital scheme. (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 468 (*Bacigalupo*); see *People v. Garcia* (1984) 36 Cal.3d 539, 552 ["special circumstances are *sui generis* — neither a crime, an enhancement, nor a sentencing factor"].) As noted, the ultimate test is whether a

7

waiver was made " ' " 'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*Collins*, *supra*, 26 Cal.4th at p. 305.) The point of a waiver colloquy, however phrased, is to inform the defendant that he is entitled to a jury trial on a separate allegation that makes him eligible for the death penalty. The trial court's failure in this case to even mention the special circumstance allegation is surely probative of whether Sivongxxay's jury waiver on that allegation was knowing and intelligent.

The court says that focusing "on perceived deficiencies in the judge's advisements to defendant" ignores other relevant circumstances, such as "defendant's prior criminal history, other events before and after the waiver was entered, and the fact that defendant was represented by counsel." (Maj. opn., *ante*, at pp. 23–24, fn. 8.) But these other considerations do not tend to show that Sivongxxay's special circumstance jury waiver was knowing and intelligent. Why is Sivongxxay's criminal history relevant when he has never been subject to California's "unique" capital scheme? (*Bacigalupo*, *supra*, 6 Cal.4th at p. 468.) And what "other events before and after the waiver was entered" is the court referring to?

As for the fact that Sivongxxay was represented by counsel, our cases have found this relevant when the record indicates that counsel discussed the implications of the waiver decision with the defendant. (See *People v. Cunningham* (2015) 61 Cal.4th 609, 636 (*Cunningham*) [upholding waiver where defendant "confirm[ed] he had discussed the issue with his counsel, who concurred in the waiver"]; *People v. Weaver* (2012) 53 Cal.4th 1056, 1070–1071 [upholding waiver where defense counsel "stated that he, the other defense attorney, defendant, and defendant's father had discussed the matter together the day before for about two hours, and that the attorney believed waiving a jury was in defendant's best interest"]; *People v. Scott* (1997) 15 Cal.4th 1188, 1208 (*Scott*)

8

[upholding waiver where "[d]efense counsel stated that he and defendant had discussed the matter, and both agreed that the waiver was in defendant's best interests 'in terms of trial tactics' "]; *Diaz*, *supra*, 3 Cal.4th at p. 565 [upholding waiver where defendant "told the court that he had discussed the matter 'quite thoroughly' with his counsel"]; *People v. Robertson* (1989) 48 Cal.3d 18, 36 (*Robertson*) [upholding waiver where defendant "was represented by two apparently competent counsel who over the course of several days discussed with him 'at length' the consequences and nature of his proposed waiver"]; *People v. Deere* (1985) 41 Cal.3d 354, 357, 359 [defense counsel "explained at length to the court why he permitted his client . . . to waive a penalty jury" and affirmed that "defendant 'knows what would happen if the case went to jury trial' "].) Nothing in the record here indicates that Sivongxxay discussed the nature or consequences of his jury waiver with his attorney.

The court adds that Sivongxxay's "failure to express any surprise or confusion regarding the judge's assertion that the waiver applied to 'all issues' represents a relevant consideration in ascertaining the nature and extent of his waiver." (Maj. opn., *ante*, at p. 14, fn. 2.) But if Sivongxxay *had* expressed surprise or confusion, presumably the trial judge or counsel would have clarified the issue, and we would not be here discussing it on appeal. In essence, the court would require the record to affirmatively demonstrate that Sivongxxay did not know he was entitled to a jury trial on the special circumstance allegation. That is not what the law requires, and for good reason: Where a defendant claims he did not understand the nature of his jury trial right and the consequences of waiving it, it makes no sense to say the defendant can prevail only if the record shows that he did not know what he did not know.

In sum, the waiver colloquy did not mention the special circumstance allegation, and nothing else shows that Sivongxxay understood the nature of the

9

allegation before he waived his right to a jury trial. On this record, I do not see how the court can conclude that Sivongxxay waived a jury trial on the special circumstance allegation " ' " 'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*Collins*, *supra*, 26 Cal.4th at p. 305.) Sivongxxay was denied a jury trial on the special circumstance allegation in violation of the federal and state Constitutions.

## II.

Notwithstanding its constitutional holding, today's opinion concludes that the trial court, in proceeding to a bench trial on the special circumstance allegation, violated section 190.4(a) by failing to take "a 'separate' waiver" with the "specificity" required by the statute. (Maj. opn., *ante*, at p. 30.) But the court holds that the error does not require automatic reversal. To obtain relief, the court says, Sivongxxay must demonstrate a reasonable probability that he would have chosen a jury trial on the special circumstance allegation if the trial court had sought a separate waiver. (*Id.* at p. 33.) The court concludes that Sivongxxay has not carried this burden and therefore finds the error harmless. (*Id.* at pp. 44–45.)

At the outset, it bears mention that no party mentioned this theory of harmless error in the principal briefs. Sivongxxay maintained that the statutory error is structural; the Attorney General argued only that any error was harmless because, given the overwhelming evidence in support of the robbery-murder allegation, a jury would have found the allegation to be true. It was not until well after oral argument, when this court vacated submission and invited supplemental briefing on the theory adopted today, that the Attorney General embraced it. Although this court is not limited to the parties' arguments in conducting harmless error review (Cal. Const., art. VI, § 13), the fact that no party thought to advance the court's theory suggests its novelty.

10

(As an aside, I find it troubling that the Attorney General's supplemental brief contends — at the eleventh hour, with no explanation for its belated epiphany — that our precedent "virtually compels" the harmless error analysis in today's opinion.  The absence of any explanation risks the perception that the Attorney General's new contention is opportunistic or that his initial briefing, having missed a theory "virtually compel[led]" by our precedent, was of questionable competence.  Neither does wonders for the government's credibility.  (See *People v. Eubanks* (1996) 14 Cal.4th 580, 589 [the prosecutor " ' "is in a peculiar and very definite sense the servant of the law" ' " and must exercise his or her functions " 'with the highest degree of integrity and impartiality' "]; Corrigan, *On Prosecutorial Ethics* (1986) 13 Hastings Const. L.Q. 537, 537 ["the integrity of the prosecutor" "lies at the heart of our criminal justice system and is the foundation from which any prosecutor's authority flows"].)  This is not the first time this concern has arisen in recent years.  (See *People v. Grimes* (2016) 1 Cal.5th 698, 720 [Attorney General did not argue harmless error in her briefing but then, without explanation, argued harmless error after this court requested supplemental briefing]; *People v. Aranda* (2012) 55 Cal.4th 342, 367, fn. 13; *id.* at p. 379 (conc. & dis. opn. of Liu, J.) [Attorney General conceded in her answer brief that instructional error required reversal but then, without explanation, switched her position after this court requested supplemental briefing].))

In any event, the court's theory of harmless error does not withstand scrutiny.  The reasoning of our recent decisions in *Blackburn*, *supra*, 61 Cal.4th 1113, and *Tran*, *supra*, 61 Cal.4th 1160, makes clear that a violation of section 190.4(a) is structural error.  In *Blackburn*, we interpreted the statutory scheme governing involuntary commitment proceedings for mentally disordered offenders.  Under section 2972, subdivision (a), a hearing to extend an offender's commitment beyond the termination of parole "shall be by jury unless waived by

11

both the person and the district attorney." Although Blackburn's lawyer had submitted a request for a bench trial, we concluded that the trial court erred in failing to elicit a personal jury trial waiver from Blackburn. (*Blackburn*, at p. 1130.) This error, we said, "defies ordinary harmless error analysis. To speculate about whether a defendant would have chosen a jury trial if he or she had been in a position to make a personal choice would pose insurmountable difficulties, as would an inquiry into what effect, if any, that choice would have had on the outcome of the trial. . . . '[W]here a case improperly is tried to the court rather than to a jury, there is no opportunity meaningfully to assess the outcome that would have ensued in the absence of the error.' [Citation.] Accordingly, we treat a trial court's failure to obtain a required personal jury trial waiver as tantamount to the denial of a jury trial, and as such, it constitutes a 'miscarriage of justice' under California Constitution, article VI, section 13. [Citations.]" (*Blackburn*, at p. 1134.)

Importantly, we observed that the Court of Appeal in *Blackburn* had said "the trial court could 'reasonably expect counsel to discuss all pertinent matters that will arise or that have arisen in pretrial hearings, including the right to a jury trial and whether to have one.' The Court of Appeal added that 'this was not the first extension of defendant's MDO commitment, and the record does not suggest that defendant was unaware of his right to a jury trial notwithstanding the lack of a judicial advisement. Nor does the record suggest that defendant was unaware that counsel intended to waive a jury and had done so or that defendant wanted a jury trial and objected (or would have objected) to counsel's waiver.' " (*Blackburn*, *supra*, 61 Cal.4th at p. 1130.) Despite these circumstances, however, we declined to place the burden on the defendant to show he wanted a jury trial: "The statute does not require the defendant to affirmatively show he or she wanted a jury trial; a jury trial is the default procedure absent a personal waiver." (*Id*. at p. 1131.)

12

Our decision in *Tran* reached the same holding on the same reasoning with respect to the jury trial guarantee of section 1026.5, subdivision (b)(4), which governs a commitment extension proceeding for a person who pleaded not guilty by reason of insanity. (*Tran*, *supra*, 61 Cal.4th at p. 1169.)

In the case before us, section 190.4(a) guarantees a jury trial on a special circumstance allegation even if the defendant waives a jury for other phases of the trial: "If the defendant was convicted by the court sitting without a jury, the trier of fact [on the special circumstance allegation] shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court." In *Memro*, we made clear that section 190.4(a) mandates a jury trial on a special circumstance allegation unless the defendant makes "a separate, personal waiver." (*Memro*, *supra*, 38 Cal.3d at p. 704.) The court today holds that a defendant is not entitled to a jury trial on a special circumstance allegation, even if he has made no separate waiver, unless he can affirmatively show on the record that he wanted a jury trial. This holding inverts the rule stated in section 190.4(a): Whereas the statute requires a jury trial unless the record shows the defendant *did not* want one, the court allows the denial of a jury trial unless the record shows the defendant *did* want one. Here, as in *Blackburn* and *Tran*, a jury trial is the default procedure mandated by statute. Here, as in *Blackburn* and *Tran*, a defendant is entitled to a jury trial without an affirmative showing that he wanted one. And here, as in *Blackburn* and *Tran*, a trial court's failure to obtain a valid waiver before conducting a bench trial is a structural error requiring automatic reversal.

The court purports to distinguish *Blackburn* and *Tran* on the ground that the trial court in those cases did not obtain any waiver of a jury trial, whereas the trial court in this case did obtain a jury trial waiver as to the guilt and penalty phases. (Maj. opn., *ante*, at pp. 40–41.) Here, according to today's opinion, the trial court committed "an error in advisement." (*Id.* at pp. 33, 35, 38.) This characterization

13

of the error leads the court to rely on case law holding that errors in advisement do not warrant reversal unless the defendant can show he would have made a different choice had he been properly advised.  (*Id.* at pp. 33–38.)

Taking this reasoning on its own terms, I find it telling that the court does not bother to spell out what constituted the "error in advisement" here.  Were the court to do so, it would have to acknowledge that the waiver colloquy, culminating in the trial court's acceptance of "a jury waiver on all issues," nowhere advised Sivongxxay that the waiver covered the special circumstance allegation.  But this would run directly counter to the court's earlier determination that "[t]he trial court's advisement conveyed that defendant had a right to a jury trial with regard to all issues as to which an adverse determination could expose him to the death penalty — which included the special circumstance allegation — and that with his waiver, defendant would be giving up that right." (Maj. opn., *ante*, at p. 25.)  How can the court find "an error in advisement" arising from the trial court's failure to mention the special circumstance allegation and yet rely on what "[t]he trial court's advisement conveyed" to show that Sivongxxay knowingly and intelligently waived a jury trial on the special circumstance allegation?  Although I recognize there is an analytical distinction between the statutory and constitutional validity of a trial court's advisement in this context, the distinction is narrow to the point of nonexistent on the facts here.

As to the applicability of harmless error analysis, to describe the error here as "an error in advisement" is a euphemistic play on words.  Sivongxxay was "misadvised" only in the sense that the trial court told him *nothing at all* that would have informed him that his jury trial waiver on "all issues" covered the special circumstance allegation.  Against the backdrop of a statute requiring a separate waiver, this is tantamount to a complete failure to obtain a proper jury trial waiver on the special circumstance allegation.  Sivongxxay did not suffer a

14

mere error in advisement; he suffered an unlawful deprivation of the jury trial guaranteed by section 190.4(a).

The circumstances here do not resemble the contexts in which we have "assess[ed] whether a defendant would have made a different decision absent an error in advisement." (Maj. opn., *ante*, at p. 33.) In *People v. Martinez* (2013) 57 Cal.4th 555, *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, and *In re Alvernaz* (1992) 2 Cal.4th 924, this court evaluated whether a defendant would have accepted a plea deal had the trial court or counsel properly advised the defendant of the consequences. In *People v. Sanchez* (1995) 12 Cal.4th 1, we held that a defendant's jury trial waiver was valid despite the trial court's failure to inform him of the potential maximum and minimum terms of imprisonment. And *U.S. v. Williams* (7th Cir. 2009) 559 F.3d 607 held that under the federal plain error standard, a district court's failure to conduct a proper colloquy before taking a jury trial waiver does not warrant reversal unless the defendant can show he would have chosen a jury trial had he been properly advised. All of these cases presented scenarios in which an error in advisement occurred in the course of the defendant's actual decision to waive a particular right. None involved a scenario in which trial court error resulted in no actual decision by the defendant to waive a particular right. It is one thing for a reviewing court to assess how an error might have affected a waiver decision that the defendant actually made; it is quite another for a reviewing court to imagine what decision the defendant would have made if he had been given an opportunity to make a decision at all.

The more pertinent authority is *Fortune v. U.S.* (D.C. 2013) 59 A.3d 949 (*Fortune*). There the trial court held a jury trial for each of defendant's offenses except for his felon in possession charge, which proceeded to a bench trial even though the defendant had not entered a jury waiver. (*Id*. at p. 954.) District of Columbia Code section 16–705, subdivision (a) provides that where a defendant is

15

constitutionally entitled to a jury, a "trial shall be by jury, unless the defendant in open court expressly waives trial by jury and requests trial by the court, and the court and the prosecuting officer consent thereto." On appeal, the court explained that "the importance of the right to a jury trial, the explicit statutory command in this jurisdiction that trial shall be by jury absent an express waiver by the defendant in open court, and the relative inability of a reviewing court to engage in review of whether the error affected the defendant's rights, all counsel in favor of holding that the failure to make the prescribed determination of waiver is a structural error, one that obviates the need for further inquiry into whether the defendant's substantial rights were affected by the error." (*Fortune*, at pp. 956–957.) In reaching this conclusion, the court "reject[ed] as speculative the government's argument that '[q]uite obviously, [Mr. Fortune] was aware that he was entitled to have a jury trial.' The record does not tell us what Mr. Fortune did or did not know, and we decline to ascribe knowledge to Mr. Fortune based on the representations of his counsel or the procedural posture of his case." (*Id*. at p. 955, fn. 5.)

Today's opinion says *Fortune* is distinguishable because it involved "an error of constitutional dimensions." (Maj. opn., *ante*, at p. 41.) But *Fortune* did not address constitutional error; it addressed "the trial court's error in failing to seek a waiver of the jury trial" in accordance with procedures mandated by a specific statute and by judicially articulated rules pursuant to the statute. (*Fortune*, *supra*, 59 A.3d at p. 955; see *id*. at p. 957 [describing the error as "the failure to make the prescribed determination of waiver"].) The court in *Fortune* declined to look behind the statutory error to ask whether the defendant would have waived a jury trial if the trial court had followed the appropriate waiver procedure. The same approach applies here.

16

At the core of today's decision is the court's intuition that there is no basis to think Sivongxxay, having waived a jury trial on the charged crimes and penalty, would not have waived a jury trial on the special circumstance allegation as well. (Maj. opn., *ante*, at pp. 44–45.)  But suppose counsel had advised Sivongxxay not to waive a jury trial on the special circumstance allegation.  If Sivongxxay then claimed ineffective assistance of counsel, would we be prepared to say there was " 'no rational tactical purpose' " for the choice?  (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)  Our general reluctance to second-guess defense tactics is one reason why it makes no sense "[t]o speculate about whether a defendant would have chosen a jury trial if he or she had been in a position to make a personal choice."  (*Blackburn*, *supra*, 61 Cal.4th at p. 1134.)

More fundamentally, the Legislature has determined that in the context of a capital trial, waiver of a jury trial as to some determinations should not be understood to imply waiver of a jury trial as to others.  Section 190.4(a) makes clear that even "[i]f the defendant was convicted by the court sitting without a jury," the trier of fact on the special circumstance allegation "shall be a jury unless a jury is waived."  And section 190.4, subdivision (b) (section 190.4(b)) says that even "[i]f [the] defendant was convicted by the court sitting without a jury[,] the trier of fact at the penalty hearing shall be a jury unless a jury is waived . . . ."  In the face of these statutory commands, we should not indulge in "two-out-of-three" reasoning to excuse a failure to take a separate jury trial waiver on the special circumstance allegation, just as we would not indulge such reasoning to excuse a failure to take a separate jury trial waiver on the penalty determination.  With all that is at stake in a capital trial, the Legislature saw fit to require a degree of precision in eliciting the defendant's choices as to whether a judge or a jury should decide the issues at each step of the proceeding.  This court should faithfully enforce the Legislature's directive.

17

Today's harmless error analysis changes the rules governing a capital defendant's right to a jury trial on a special circumstance allegation. Despite the plain language of section 190.4(a) and our decision in *Memro*, it does not really matter whether the trial court takes a separate jury trial waiver; that is now a mere technicality. What ultimately matters is whether the defendant has made a record showing that he wanted a jury trial on the special circumstance allegation. To be sure, the premise of harmless error doctrine is that "few if any trials are entirely free from error, and an appellate court would impair the basic functioning of the criminal justice system if it were to reverse a conviction whenever some slight misstep occurred." (*People v. Jackson* (2014) 58 Cal.4th 724, 789–790 (conc. & dis. opn. of Liu, J.).) But even if most types of error can be harmless, we must be cautious in deploying this doctrine because "to say that a conviction may stand in spite of underlying error is at odds with the norm of legality that justifies the state's imposition of criminal punishment in the first place. A declaration that an error is harmless is, in essence, a conclusion that even though a legal right has been violated, there will be no remedy for that violation." (*Id.* at p. 790.) Here, the court's particular form of harmless error inquiry does not merely foreclose a remedy; it negates the legal right itself.

Because there was no valid jury trial waiver under section 190.4(a), the true finding on the special circumstance allegation and the death judgment should be reversed.

## III.

I also disagree with the court's conclusion that Sivongxxay knowingly and intelligently waived his right to a jury trial on the penalty determination. The trial court advised Sivongxxay that upon a finding of guilt, "we would then proceed to a penalty phase, where the district attorney would present aggravation evidence. Through your — you, through your attorney, would have a right to present

18

mitigation evidence, and it would fall upon me to make the decision as to the appropriate punishment, which could result in a death penalty sentence."

Sivongxxay was not advised that a jury must achieve unanimity in order to render a penalty verdict. The significance of this omission must be considered in light of the jury's function at the penalty phase. Unlike its role at the guilt phase, the jury's role in a capital penalty trial "is not merely to find facts, but also — and most important — to render an individualized, *normative* determination about the penalty appropriate for the particular defendant — i.e., whether he should live or die." (*People v. Brown* (1988) 46 Cal.3d 432, 448; see *People v. Manriquez* (2005) 37 Cal.4th 547, 589 [" ' "the sentencing function is inherently moral and normative, not factual" ' "].) This inherently " 'moral endeavor' " (*People v. Moon* (2005) 37 Cal.4th 1, 40), which is designed " 'to maintain a link between contemporary community values and the penal system' " (*Woodson v. North Carolina* (1976) 428 U.S. 280, 295), renders a defendant's decision to waive a jury trial at the penalty phase particularly consequential.

The crux of the waiver decision is whether to submit the life-or-death penalty decision to a judge for his or her sole determination or to 12 lay jurors of differing backgrounds who must unanimously agree on a death sentence before it may be imposed. The importance of jury unanimity in the normative determination of the appropriate penalty has a character distinct from the importance of jury unanimity in the factual adjudication of guilt. Other courts have recognized as much. In *Commonwealth v. O'Donnell* (Pa. 1999) 740 A.2d 198, the trial court had made clear during its penalty phase waiver colloquy that the defendants were "entitled to a jury trial in the death penalty phase" and that they had the right to present evidence "in mitigation of the application of the death penalty." (*Id*. at p. 212.) The Pennsylvania high court nonetheless found the defendants' jury trial waiver constitutionally inadequate, principally because the

19

trial court had not explained that a sentencing jury must be unanimous in its verdict: "Given the unique role a sentencing jury plays in the penalty phase of a capital case [citation], it . . . seems appropriate for any colloquy preceding a trial court's acceptance of a capital defendant's waiver to a penalty-phase jury to inform the defendant of the requirement under Pennsylvania law that a penalty-phase jury render a unanimous verdict. The defendant should be asked, in other words, whether he understands that, if elected, a twelve member jury would be required to unanimously agree that a sentence of death is appropriate before imposing such a verdict on a defendant." (*Id.* at p. 213; see also *State v. Martinez* (N.M. 2002) 43 P.3d 1042, 1048–1049 ["As a matter of pure probability, the requirement of jury unanimity means that while a defendant who is sentenced by a judge has only one chance of avoiding the death penalty, a defendant who is sentenced by a jury has twelve. [Citation.] We agree with Defendant that a waiver of the right to be sentenced by a jury cannot be considered knowing and intelligent unless the defendant is aware of this critical aspect."]; *Miller v. Beard* (E.D.Pa. 2016) 214 F.Supp.3d. 304, 358 [granting habeas corpus relief to defendant whose waiver of a penalty phase jury was not knowing and voluntary because trial court failed to explain state unanimity requirements for sentencing juries].)

In this case, not only did the trial court give no advisement concerning unanimity; the record also contains no indication that Sivongxxay discussed the waiver with counsel or that the trial court, prosecutor, or defense counsel ever asked Sivongxxay whether he understood the nature of the right he was giving up. Further, because capital sentencing is the only context in which California law authorizes a jury to decide the appropriate punishment for a criminal offense, Sivongxxay's prior convictions for noncapital offenses in other jurisdictions

20

provide no basis to infer that he understood the significance of a waiver of his right to a jury trial at the penalty phase.

The circumstances in this case differ markedly from those in which we have found a knowing and intelligent penalty phase waiver. In *People v. Weaver* (2012) 53 Cal.4th 1056, 1076, the trial court was "exceptionally careful in taking defendant's jury waiver"; the court accepted a written penalty phase waiver form and asked defendant to reaffirm his waiver before the start of the penalty phase. In *Scott*, the trial court "explained the nature of a penalty trial," including the jury unanimity requirement; the defendant confirmed he had discussed the waiver with counsel; and both the prosecutor and trial court described in detail the penalty phase procedure. (*Scott, supra,* 15 Cal.4th at p. 1208.) In *Diaz*, the trial court explained the jury unanimity requirement; "defendant acknowledged that he had thoroughly discussed the jury waiver with his attorney"; and "when the court asked whether he had any questions regarding the waiver, or wished to discuss it further with counsel, defendant answered in the negative." (*Diaz, supra,* 3 Cal.4th at p. 571.) And in *Robertson*, the trial court explained the jury unanimity requirement, and the defendant's " 'length[y]' " consultation with counsel "over the course of several days" allowed us to infer that counsel properly advised the defendant of the nature of a penalty phase jury and the consequences of waiver. (*Robertson, supra,* 48 Cal.3d at pp. 36–37 & fn. 5.)

We have never upheld a penalty phase jury trial waiver on a record of advisement as thin as the one here. The record does not show that Sivongxxay waived his right to a jury trial on the penalty determination " ' " 'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " ' " (*Collins, supra,* 26 Cal.4th at p. 305.) Because Sivongxxay was unconstitutionally denied a jury trial at the penalty phase, the penalty judgment cannot stand.

21

Finally, the penalty phase waiver has an additional infirmity: The waiver colloquy suggested, contrary to section 190.4(b), that Sivongxxay had no separate right to a jury trial at the penalty phase if he elected a bench trial at the guilt phase. After briefly describing how a jury is selected and stating that the district attorney has the burden to prove guilt beyond a reasonable doubt, the trial court said: "In a court trial, I would hear the evidence. I, alone, would make the decision on whether that evidence was sufficient to prove your guilt beyond a reasonable doubt. [¶] *In the event I made such a finding, . . . we would then proceed to a penalty phase . . . .  [A]nd it would fall upon me to make the decision as to the appropriate punishment*, which could result in a death penalty sentence." (Italics added.) The italicized language conveyed that in the event that a bench trial resulted in a finding of guilt, the prerogative to decide the appropriate punishment would remain with the court.

Yet section 190.4(b) makes clear that "[i]f defendant was convicted by the court sitting without a jury[,] the trier of fact at the penalty hearing shall be a jury unless a jury is waived . . . ." It is not uncommon for capital defendants who opt for a bench trial on guilt to have a jury trial on the penalty determination. (See, e.g., *Cunningham*, *supra*, 61 Cal.4th at pp. 616–617; *People v. Mai* (2013) 57 Cal.4th 986, 993–994.) The trial court's advisement erroneously implied that the jury trial waiver was an all-or-nothing decision; at the very least, it did not make clear that Sivongxxay had the right to a jury trial on penalty even if he chose to waive a jury trial on guilt. Today's opinion says "[w]e do not believe that the colloquy is reasonably susceptible to this interpretation." (Maj. opn., *ante*, at p. 48, fn. 19.) *But what other reasonable interpretation is there?* The court has no answer, let alone an answer more plausible than Sivongxxay's straightforward interpretation. As with the trial court's violation of section 190.4(a), the failure to elicit a separate waiver as to the penalty determination as required by section

22

190.4(b) resulted in a complete deprivation of a jury trial, warranting automatic reversal.

## IV.

I agree with the court's conclusion that Sivongxxay's guilt phase waiver was valid, and I agree with the court's guidance on advisements that trial judges should give when eliciting jury trial waivers in the future. (Maj. opn., *ante*, at p. 17.) But I do not think we should rely on Sivongxxay's "prior experience with the criminal justice system" as evidence that he was familiar with the right to a jury trial. (*Id*. at p. 14.) We have no record of what advisements he received before entering the Oregon pleas, and the written waiver he signed in Washington State merely said he understood he had "the right to a speedy and public trial by an impartial jury," not that he understood what that right entailed. Nor is there any indication that he discussed his prior waiver decisions with counsel. (Cf. *U.S. v. Shorty* (9th Cir. 2013) 741 F.3d 961, 968; *State v. Baker* (Ariz.Ct.App. 2007) 170 P.3d 727, 730.)

In sum, I join today's affirmance of Sivongxxay's convictions, but I would reverse the special circumstance finding and the judgment of death.

**LIU, J.**

23

**CONCURRING AND DISSENTING OPINION BY CUÉLLAR, J.**

A special circumstance allegation is the means by which the trier of fact determines whether a first degree murder trial will continue to a penalty phase, at which the convicted murderer's fate — death or life imprisonment without the possibility of parole — will be decided. The federal Constitution guarantees a defendant the right to have a jury decide the truth of the special circumstance allegation. (See *Ring v. Arizona* (2002) 536 U.S. 584, 589.) California law likewise mandates that the trial of the special circumstance allegation shall be by jury, unless the right is waived separately and personally by the defendant and the People. (Pen. Code, § 190.4, subd. (a); all subsequent statutory references are to this code.) In this case, defendant was never advised of his separate right to have a jury decide the truth of the special circumstance allegation. Nor did he ever waive this right. Nonetheless, the trial court proceeded to resolve the special circumstance in a bench trial and, after a penalty phase, to sentence defendant to death.

Despite these omissions, what the majority concludes is that defendant knowingly and intelligently waived his right to have a jury decide the truth of the special circumstance allegation, and the court's failure to elicit a " 'separate waiver' " of that right was harmless. (Maj. opn., *ante*, at p. 30.) Unlike the majority, I do not believe we can meet our obligation to safeguard the right to a jury trial while minimizing — let alone ignoring — the failure to obtain

defendant's waiver of his right to a jury trial on the special circumstance allegation. (See *Ring v. Arizona*, *supra*, 536 U.S. at p. 612 (conc. opn. of Scalia, J.) ["[O]ur people's traditional belief in the right of trial by jury is in perilous decline. That decline is bound to be confirmed, and indeed accelerated, by the repeated spectacle of a man's going to his death because *a judge* found that an aggravating factor existed. We cannot preserve our veneration for the protection of the jury in criminal cases if we render ourselves callous to the need for that protection by regularly imposing the death penalty without it."].) Under the federal Constitution and state law, the failure to obtain a jury waiver requires reversal of the robbery-murder special-circumstance finding and the death judgment. I concur in the judgment to the extent it affirms defendant's convictions for murder, robbery, and attempted robbery, but otherwise respectfully dissent.

## I.

Crowded dockets, constrained budgets, and overwhelming caseloads for public attorneys create undeniable pressure to speed criminal cases along. A jury trial may be the hallmark of our criminal justice system — and the quintessential event that continues to grab the attention of movie and television viewers — but it is also the most burdensome and inefficient means of resolving a criminal accusation. So it is no surprise that over 95 percent of felony cases are resolved before trial. (Judicial Council of Cal., 2016 Court Statistics Rep., Statewide Caseload Trends 2005-2006 Through 2014-2015 (2016) p. 47.)

Even when cases go to trial, judges and attorneys are well aware that not all trials are created equal. A bench trial offers considerable savings of time and resources. Lawyers in a bench trial sidestep the need to spend time selecting a jury, presenting opening statements, addressing legal issues at sidebar, crafting jury instructions and limiting instructions, and waiting in suspense for the outcome

of a jury's deliberation. A bench trial also obviates the need to worry about the risk of a mistrial if the jury is divided or subject to improper influences. Indeed, one study of courts in California and two other states found that the median length of criminal jury trials was roughly *three times* that of criminal bench trials. (Nat. Center for State Courts, On Trial: The Length of Civil and Criminal Trials (1988) pp. 8-9.)

This backdrop helps explain why the Legislature in 1977 erected — and the voters in 1978, although repealing the statute, retained — an elaborate procedural framework protecting a capital defendant's right to a jury trial at each stage of the proceeding. In restoring the death penalty following its invalidation by this court and the United States Supreme Court, the Legislature and the voters took special care to ensure that a jury trial would be had at each phase of the death penalty trial unless the defendant personally and with specificity waived it: "If the defendant was convicted by the court sitting without a jury, the trier of fact [on the truth of each alleged special circumstance] *shall be a jury unless a jury is waived* by the defendant and by the people." (§ 190.4, subd. (a), italics added.) Likewise, "[i]f the defendant was convicted by a plea of guilty, the trier of fact [on the truth of each alleged special circumstance] *shall be a jury unless a jury is waived* by the defendant and by the people." (*Ibid.*, italics added.) And even if the defendant was convicted of murder and any special circumstance found true in a bench trial, "the trier of fact at the penalty hearing *shall be a jury unless a jury is waived* by the defendant and the people . . . . If the defendant was convicted by a plea of guilty, the trier of fact *shall be a jury unless a jury is waived* by the defendant and the people." (*Id.*, subd. (b), italics added.) Thus, a capital defendant will have a jury decide the truth of any special circumstance allegations and the appropriate penalty, despite having waived a jury in prior proceedings, unless "by the consent

3

of both parties expressed in open court by the defendant and the defendant's counsel" a jury is waived.  (Cal. Const., art. I, § 16.)

Nothing about this scheme indicates or even suggests a tether between the right to have a jury decide the truth of a special circumstance allegation and a defendant's right to a jury trial on guilt or innocence of the underlying offenses, or any other right.  To the contrary:  Even if the defendant waived a jury at the guilt phase (or pleaded guilty), the law requires a jury to decide the truth of the special circumstance, unless the defendant waives that right.  The separate nature of the jury trial right articulated in section 190.4 places it outside "the general rule" (maj. opn., *ante*, at p. 21, fn. 5) on which the majority relies — i.e., that a jury waiver is deemed to be consent " ' "to a trial of all issues in the case before the court sitting without a jury." ' "  (*Id*. at p. 21, quoting *People v. Berutko* (1969) 71 Cal.2d 84, 94 (*Berutko*).)  In *Berutko*, we analyzed three statutes governing the right to a jury trial for a prior conviction allegation.  In stark contrast to section 190.4, not one of these statutes created an independent right to a jury notwithstanding the defendant's waiver of a jury with respect to the underlying substantive offense.[1]

---

[1]     Former section 969 1/2 (now section 969.5) then provided in pertinent part that " 'the question whether or not he has suffered such previous conviction must be tried by a jury impanelled for that purpose, unless a jury is waived, in which case it may be tried by the court' " (*Berutko*, *supra*, 71 Cal.2d at p. 94, quoting former § 969 1/2, added by Stats. 1935, ch. 203, § 1, p. 862); former section 1025 then provided in pertinent part that "the question whether or not he has suffered such previous conviction must be tried by the jury which tries the issue upon the plea of not guilty, or in case of a plea of guilty, by a jury impaneled for that purpose, or by the court if a jury is waived" (Stats. 1951, ch. 1674, § 88, p. 3844); and section 1158 provided, as it does today, that "[w]henever the fact of a previous conviction of another offense is charged in an accusatory pleading, and the defendant is found guilty of the offense with which he is charged, the jury, or the judge if a jury trial is waived, must unless the answer of the defendant admits such previous conviction, find whether or not he has suffered such previous conviction."

*(Footnote continued on next page.)*

In rejecting Berutko's contention that his general jury waiver encompassed only the substantive offenses and did not extend to the prior conviction allegation, we concluded that " '[t]he whole spirit and intent of these statutes appear to be that a prior conviction charge is to be determined solely as one of the issues in the trial for the new offense.' " (*Berutko*, at p. 94.)  Section 190.4, on the other hand, is not premised on the idea that the truth of the special circumstance allegation or the choice of penalty is merely one among the many issues in a " 'one trial' " system. (*People v. Jarmon* (1992) 2 Cal.App.4th 1345, 1354.)  No matter which decision maker a defendant chooses for the guilt phase, the trier of fact *shall* be a jury when it comes to the special circumstance allegation or the penalty determination, unless a jury is waived.  (§ 190.4, subds. (a), (b).)  Accordingly, a jury waiver directed at the guilt phase of a capital trial does not suffice to waive jury trial for the special circumstance or the penalty.  (See generally *People v. Redwine* (1958) 166 Cal.App.2d 371, 376 ["waiver of the right of trial by jury should be strictly construed in favor of the preservation of the right"].)

This is what we made clear in *Memro*, *supra*, 38 Cal.3d 658 as to the special circumstance allegation.  We held that section 190.4, subdivision (a)

---

*(Footnote continued from previous page.)*

Although section 190.1, subdivision (a) does state that (except for the prior murder special circumstance) "[i]f the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged," we have previously explained that a broad reading of this provision "would render the jury trial guarantee in section 190.4, subdivision (a) meaningless in many special circumstance cases." (*People v. Memro* (1985) 38 Cal.3d 658, 702 (*Memro*).)  Indeed, section 190.1, subdivision (a) plainly has no application any time the trier of fact at the guilt phase and the special circumstance phase are different, since it would be impossible for "the trier of fact" in such a situation to determine guilt of first degree murder and the truth of any special circumstances "at the same time." (See *Memro*, at p. 701.)

5

requires "that an accused whose special circumstance allegations are to be tried by a court must make *a separate, personal waiver* of the right to a jury trial." (*Memro*, at p. 704, italics added.)  We distinguished *Berutko*'s general rule and the prior conviction statutes on which it relied, and for good reason.  The prior conviction statutes reflected an entirely different " 'spirit and intent' " than what could be gleaned from the "separate jury waiver . . . necessary for special circumstance allegations in death penalty legislation."  (*Memro*, at p. 702, fn. 52.) Under the death penalty scheme, a separate waiver requires a showing that "the defendant is aware that the waiver applies to each of these aspects of trial" (*People v. Diaz* (1992) 3 Cal.4th 495, 565 (*Diaz*)) — i.e., guilt *and* special circumstances — as well as proof that the "waiver of the jury-trial right on a special circumstance actually cover[s] the special circumstance." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1105.)

No such waiver occurred here.  (Maj. opn., *ante*, at pp. 29-30.)  So it is quite puzzling that even as the majority concedes the lack of a waiver, it nonetheless concludes defendant knowingly and intelligently waived his federal constitutional right to have a jury decide the truth of the special circumstance allegation.  What makes a jury waiver knowing and intelligent is that it was "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran v. Burbine* (1986) 475 U.S. 412, 421; accord, *People v. Weaver* (2012) 53 Cal.4th 1056, 1071-1072 [applying this standard to a jury waiver].)  In this case, though, *nothing* made defendant aware that he had the right to a jury trial on the truth of the special circumstance allegation.  Indeed, defendant was given the misimpression that his capital trial would consist only of an initial guilt phase, during which the court "would make the decision whether that evidence was sufficient to prove your guilt beyond a reasonable doubt," and "[t]hen, and only then, would we get to a penalty phase."

6

He was never informed that if the prosecutor established his guilt beyond a reasonable doubt, the trier of fact would then, and only then, consider the truth of the special circumstance allegation, nor did anyone ever refer to a "special circumstance" or other type of "allegation" whose truth would make him eligible for the death penalty. And of course, defendant was never informed that his waiver encompassed the right to a jury trial on such an allegation.

Recognizing the colloquy's inadequacies, the majority deploys vague references invoking "other events before and after the waiver was entered" (maj. opn., *ante*, at p. 24, fn. 7) as evidence of what it repeatedly — and inaccurately — calls a "comprehensive" jury waiver. (*Id*. at pp. 21, 23, fn. 7, 26.) The record's deficiencies are not so easily evaded. Defendant's out-of-state convictions for robbery and unauthorized use of a vehicle provide no basis for inferring that he understood his trifurcated right to a jury under California's death penalty scheme in general or his right to have a jury decide the truth of the special circumstance in particular. (See *People v. Brown* (Ill. 1996) 661 N.E.2d 287, 301 ["The record reveals . . . that the defendant had no previous experience which involved a death penalty hearing and, thus, there is no basis to presume that the defendant understood that he had the right to a jury for death sentencing and, in particular, that he had this right even if he chose a bench trial"].)

The majority also purports to rely on silence — specifically, the defendant's silence in response to the trial court's assertion that "[w]e'll show a jury waiver on all issues, confirm the matter for January the 11th." (See maj. opn., *ante*, at p. 14 & fn. 2.) Given the trial court's erroneous description of the "issues" to be tried as consisting solely of a guilt phase and a penalty phase, however, it is difficult to comprehend how the trial court's summary could somehow have expanded the preceding waiver to encompass the special circumstance allegation. In any event, silence here is the problem, not the solution: It is well-established

7

under the California Constitution that neither silence nor acquiescence implies a waiver of the right to a jury trial. The defendant must instead expressly waive the right. (*People v. Ernst* (1994) 8 Cal.4th 441, 445.) Accordingly, cases from jurisdictions allowing counsel to waive jury on the defendant's behalf shed no light on the issue before us. (See *U.S. v. Boynes* (4th Cir. 2008) 515 F.3d 284, 287 [defendant "insisted" on waiving jury and explained to counsel why he "would have a better chance" with a judge]; *U.S. v. Page* (5th Cir. 1981) 661 F.2d 1080, 1083; [defendant conferred with counsel "at length" and made a "considered, tactical decision that a bench trial would be to [his] advantage"]; *State v. Baxter* (Mo. 2006) 204 S.W.3d 650, 654 [where counsel waived jury, and the prosecutor announced "in open court that there was an agreement that the charges would be reduced in exchange for a waiver," "[t]here is no reason to require that the judge question the defendant on the record . . . ."].)

The only exchange involving defendant — and the one on which the majority is therefore forced to place principal reliance — is defendant's assent to the trial court's final question at the pretrial waiver hearing: "Do you give up your right to a jury trial and agree that this Court, alone, will make those decisions . . . ?" (Quoted by maj. opn., *ante*, at p. 24.) But where no one — not the trial court, not the prosecutor, and not defense counsel — ever mentioned that a trial would also occur on the truth of the special circumstance and that he was being asked to waive his right to a jury trial at such a proceeding, it is difficult to credit the majority's contention that the "advisements the trial court provided to defendant before taking his waiver, together with the other surrounding circumstances, confirm that defendant knowingly and intelligently relinquished his right to a jury trial for this allegation." (*Id.* at p. 23.) In short, the majority fails to identify anything in the record supporting its conclusion that defendant was aware of the nature of the right he was abandoning or the consequences of abandoning it.

8

Those consequences depend in part on a given jurisdiction's law. The majority's approach, for example, seems to track *Ohio's* death penalty scheme, which provides for an all-or-none waiver of what the statute treats as a unitary jury trial right: The sentencer will be "the trial jury and the trial judge, if the offender was tried by jury," but otherwise must be "the panel of three judges that tried the offender upon the offender's waiver of the right to trial by jury." (Ohio Rev. Code Ann. § 2929.03(C)(2)(b).) Thus, under Ohio law, the "[t]he waiver of the right to trial by jury in a capital case applies to both the guilt phase and the penalty phase of the trial." (*State v. Foust* (Ohio 2006) 823 N.E.2d 836, 852.)

But Ohio law is materially different from California's, which maintains a jury trial as the default even if the defendant has waived jury at a previous phase of the trial. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1027.) So *Foust* sheds no light on what constitutes a knowing and intelligent waiver in the context of the California death penalty scheme. If we are going to look beyond California for insight, we should instead train attention on statutory schemes resembling our own — such as those in Illinois and Pennsylvania. In *People v. Brown*, *supra*, 661 N.E.2d 287 (*Brown*) and *Commonwealth v. O'Donnell* (Pa. 1999) 740 A.2d 198 (*O'Donnell*), the Supreme Courts of Illinois and Pennsylvania each held that a jury waiver at the initial phase of a death penalty trial did *not* constitute a knowing and intelligent waiver of a jury at the penalty phase. (*Brown*, at pp. 298-299; *O'Donnell*, at pp. 212-214.) Like California — and unlike Ohio — Illinois and Pennsylvania provide for a jury trial at the penalty phase even if the defendant was convicted at a bench trial. (See 720 Ill. Comp. Stat. 5/9-1(d) ["The proceeding shall be conducted: [¶] . . . [¶] (2) before a jury impanelled for the purpose of the proceeding if: [¶] A. the defendant was convicted upon a plea of guilty; or [¶] B. the defendant was convicted after a trial before the court sitting without a jury . . . ."]; 42 Pa. Cons. Stat. § 9711(b) ["If the defendant has waived a jury or

9

pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose unless waived by the defendant with the consent of the [prosecution]"].)  Both state supreme courts construed their statutory schemes to *require* a jury trial at the penalty phase unless the defendant specifically waived that right.  (*Brown,* at p. 298 ["The statute further provides that the death sentencing proceeding may be conducted before the trial judge alone only if the defendant 'waives a jury for the separate proceeding' "]; *O'Donnell*, at p. 211 [the statute "clearly indicates that if the defendant has waived a jury trial in the guilt phase, as Appellant did here, the defendant is still entitled to have a jury determine his sentence unless he specifically waives that right without objection by the Commonwealth"].)  Although neither court then believed that the defendant had a federal constitutional right to a jury trial at the penalty phase (see *Spaziano v. Florida* (1984) 468 U.S. 447, 464-465, overruled by *Hurst v. Florida* (2016) ___ U.S. ___, ___ [136 S.Ct. 616, 623]), they nonetheless imposed a requirement that the jury waiver be knowing, intelligent, and voluntary.  (*Brown*, at p. 298; *O'Donnell*, at p. 212.)

These state supreme courts held that a jury waiver made without specifying what was being waived was insufficient.  In the Illinois case, the defendant was advised — and indicated he understood — that he would lose his " '*constitutional right to a jury trial* in this case, and this case will then be heard and decided by this court without a jury[].' " (*Brown*, *supra*, 661 N.E.2d at p. 297.)  In finding the waiver was neither knowing nor intelligent as to the penalty phase, the Supreme Court of Illinois stated that it was "incumbent upon the trial judge to admonish the defendant in order to clarify the scope of his intended jury waiver," and that "at a minimum the trial judge should have advised the defendant of his right to a jury for sentencing."  (*Id*. at p. 299.)  Similarly, the Supreme Court of Pennsylvania found an inadequate waiver when the record failed to show that the defendant

10

understood she "ha[d] the right to be sentenced by a penalty-phase jury" and was "devoid of any inquiry indicating that [she] had sufficient knowledge of what, in fact, she was waiving." (*O'Donnell*, *supra*, 740 A.2d at p. 213; accord, *Taylor v. Horn* (3d Cir. 2007) 504 F.3d 416, 449 ["we cannot presume, based on a silent record, that he knowingly and voluntarily waived his state law right to a penalty phase jury"].)

Here, of course, defendant *had* a federal constitutional right to require that a jury decide the truth of the special circumstance. (*People v. Weaver*, *supra*, 53 Cal.4th at p. 1074; see *Ring v. Arizona*, *supra*, 536 U.S. at p. 589.) So the failure to obtain a knowing and intelligent jury waiver — or any waiver at all — with respect to the special circumstance was federal constitutional error. But *Brown* and *O'Donnell* are otherwise similar to this case in all important respects: The trial court record failed to show that defendant understood the proceedings would require a separate phase, during which his eligibility for the death penalty would be determined; that he was aware he had a right to a jury at that phase of the trial; or that he was aware he was waiving jury trial as to that part of the proceedings. Indeed, the existence of the special circumstance was never mentioned. That makes for quite a contrast with *Diaz* — on which the majority misplaces reliance — where the defendant (who was charged with 12 multiple-murder special circumstances) acknowledged that his waiver "applied to 'both phases . . . of the special circumstances case' " (*Diaz*, *supra*, 3 Cal.4th at p. 564) and stated that "he had discussed the matter 'quite thoroughly' with his counsel" (*id*. at p. 565).

It should be crystal clear that no decision by this court or the high court has ever found a knowing and intelligent waiver of the trifurcated right to a jury without proof that the defendant was aware of his right to a jury trial at each of the three stages. We distort the meaning of the words "knowing" and "intelligent" when we find such a waiver even where the defendant fails to grasp that he has a

11

right to have a jury decide the truth of the separate allegation that will render him eligible for the death penalty.

The gist of defendant's claim is that the record fails to show he was aware of his right to a jury trial on this phase of the trial or that he waived it. *State v. Williams* (Or.Ct.App. 2005) 104 P.3d 1151 presents an analogous situation. Williams similarly was unaware that he had the right to a jury finding of the facts that could trigger an enhanced sentence; his trial had predated *Blakely v. Washington* (2004) 542 U.S. 296, which held that a criminal defendant has a federal constitutional right to have a jury find the facts that could subject him to a sentence greater than the statutory maximum. The *Williams* court reasoned that no waiver could be implied in those circumstances unless the record showed that the defendant was aware both of " 'the right to have a jury determine the aggravating factors' " and that " 'he was waiving that right.' " (*Williams*, at p. 1152; accord, *People v. French* (2008) 43 Cal.4th 36, 48 [because the defendant entered his plea pre-*Blakely,* his jury waiver on the substantive offense "did not encompass his right to a jury trial on any aggravating circumstances"]; *State v. Schofield* (Me. 2005) 895 A.2d 927, 930-931.) Unlike the majority, I see no meaningful distinction in the fact that Williams was unaware of his jury trial right because of an intervening change in the law, while defendant was unaware of his jury trial right because it was never mentioned anywhere in the colloquy. (Cf. maj. opn., *ante*, at p. 22, fn. 7.) In neither situation does the record show that "the defendant 'knows what he is doing and his choice is made with eyes open.' " (*Iowa v. Tovar* (2004) 541 U.S. 77, 88.)

From all these reasons I draw an unremarkable conclusion. A defendant does not knowingly and intelligently waive his federal constitutional right to have a jury determine the truth of a special circumstance allegation where there is nothing in the record to indicate that the defendant was aware of the right to have a

12

jury determine the truth of the special circumstance or that the defendant intended to waive that right.

## II.

Even if considered solely as an error under state law, though, the trial court's decision to conduct a bench trial on the special circumstance allegation requires reversal of the special circumstance and the death judgment. As the majority readily concedes (maj. opn., *ante*, at p. 28), there was no "separate, personal waiver" of defendant's right to have a jury determine the truth of the special circumstance allegation as required by section 190.4, subdivision (a). (*Memro*, *supra*, 38 Cal.3d at p. 704.)

How should we measure the effect of that error? We typically interpret the miscarriage of justice provision of our state Constitution (Cal. Const., art. VI, § 13) to require a party challenging the judgment to demonstrate that "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.) But not always. Certain errors — such as the erroneous denial of a jury trial — can constitute a miscarriage of justice and thus require reversal of the judgment "without inquiry into the strength of the evidence in a particular case." (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1133 (*Blackburn*).) Rightly so, because such errors deny " 'an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected. For example, if a court should undertake to deny a defendant charged with a felony the right of trial by jury, and after a hearing of the evidence render a judgment of conviction, it cannot be doubted that such judgment should be set aside even though there had been the clearest proof of guilt.' " (*Id*. at p. 1139, quoting *People v. O'Bryan* (1913) 165 Cal. 55, 65-66.)

13

We recently examined the effect of the failure to obtain a valid jury waiver in the context of a trial to extend the civil commitment of a mentally disordered offender (MDO) (*Blackburn*, *supra*, 61 Cal.4th 1113) and a person originally committed after pleading not guilty by reason of insanity (NGI) to a criminal offense (*People v. Tran* (2015) 61 Cal.4th 1160).  The MDO and NGI commitment statutes, like section 190.4, subdivision (a), provide that "[t]he trial *shall be by jury* unless waived by both the person and the [People]."  (§§ 1026.5, subd. (b)(4), 2972, subd. (a), italics added.)  In neither case, however, had the trial court advised the committee of his right to a jury trial or elicited a personal jury waiver from the committee.  (*Blackburn*, at pp. 1123-1125; *Tran*, at pp. 1166-1168.)  We held that the failure to obtain the statutorily required jury trial waiver qualified as a structural defect in the proceedings that could not be cured by resort to harmless error analysis.  (*Blackburn*, at pp. 1133-1136; *Tran*, at pp. 1169-1170.)

In words that have special force here, we declared that "[i]f the case now before us were a criminal matter involving the invalid waiver of a state or federal constitutional jury trial right, there could be no doubt that the error would constitute a 'miscarriage of justice' requiring reversal without regard to the strength of the evidence."  (*Blackburn*, *supra*, 61 Cal.4th 1133; see *People v. Ernst*, *supra*, 8 Cal.4th at p. 443 (*Ernst*) ["a judgment in a criminal case resulting from a court trial must be reversed if the defendant did not expressly waive the right to a trial by jury"].)  We then reasoned that "[t]he failure to obtain a valid jury trial waiver" — regardless of whether the source of the jury trial right was constitutional or merely statutory — "defies ordinary harmless error analysis." (*Blackburn*, at p. 1134.)  Indeed, "[t]o speculate about whether a defendant would have chosen a jury trial if he or she had been in a position to make a personal choice would pose insurmountable difficulties . . . .  Accordingly, we treat a trial court's failure to obtain a required personal jury trial waiver as tantamount to the

14

denial of a jury trial, and as such, it constitutes a 'miscarriage of justice' under California Constitution, article VI, section 13." (*Ibid.*; see *People v. Holmes* (1960) 54 Cal.2d 442, 444.)

Our sister courts are in accord. (*Fortune v. U.S.* (D.C. 2009) 59 A.3d 949, 956-957 ["the importance of the right to a jury trial, the explicit statutory command in this jurisdiction that trial shall be by jury absent an express waiver by the defendant in open court, and the relative inability of a reviewing court to engage in review of whether the error affected the defendant's rights, all counsel in favor of holding that the failure to make the prescribed determination of waiver is a structural error"]; *State v. Williams*, *supra*, 104 P.3d at p. 1153 ["We cannot assume that defendant, by waiving a jury trial on the burglary charge, intended to waive the right to have a jury determine the facts required for imposition of an enhanced dangerous offender sentence"].)

Despite widespread agreement that harmless error analysis does not apply — chiefly because it is impossible to reconstruct what choice a defendant would have made when he was never actually presented with the choice — the majority nonetheless contends that the trial court's failure to obtain a jury waiver covering this critical stage of a death penalty proceeding is *always* harmless, unless the defendant can demonstrate a reasonable probability he would not have waived jury trial if actually offered the opportunity to do so. (Maj. opn., *ante*, at pp. 44.) To subject the failure to elicit a defendant's waiver of his jury trial right to retrospective speculation of what the defendant would have decided is to dilute the importance of a right with abiding structural significance. So it is not surprising that the majority is unable to cite even a single case holding that this harmless error analysis applies when, as here, a defendant has properly preserved his claim that he never waived his right to a jury trial. The majority relies instead on cases

15

— easily distinguishable from this one — where the defendant waived a jury, but claimed his jury waiver was a product of a misadvisement.

In *U.S. v. Williams* (7th Cir. 2009) 559 F.3d 607, for example, the defendant knew he had a right to a jury trial and twice waived it in open court. The Seventh Circuit determined that the defendant had not preserved his claim that the trial court erred in failing to secure a written jury waiver and to mention certain advisements. (*Id*. at pp. 607-609.) Only then did the court conclude that the defendant had failed to discharge his burden under plain error review to establish prejudice. (*Id*. at p. 613.) In *State v. Keller* (Iowa 2009) 760 N.W.2d 451, the defendant executed a written jury waiver, but any oral colloquy went unreported. The court concluded that counsel's failure to ensure that the advisements were made on the record was not prejudicially ineffective. (*Id*. at pp. 452-453; accord, *People v. Maxwell* (Ill. 1992) 592 N.E.2d 960, 974 [the defendant executed a written jury waiver and waived jury trial in open court; counsel's erroneous view about the admissibility of other-crimes evidence was "irrelevant" to her advice to the defendant about the jury waiver; and even if counsel were ineffective, "[i]t is clear in this case that defense counsel would have offered the same recommendation" regardless of the evidence's admissibility]; *Commonwealth v. Houck* (Pa. 2008) 948 A.2d 780, 788 [the defendant executed a written jury waiver and waived jury trial in open court; he was not entitled to relief on his claim of misadvisement because he failed "to demonstrate that his . . . understanding of the length of the potential sentence was a material factor in making the decision to waive a jury trial"]; *Commonwealth v. Mallory* (Pa. 2008) 941 A.2d 686, 697 [the defendants "explicitly waived their rights to a jury, in writing, on the record" but claimed their attorneys were ineffective in failing to arrange an oral colloquy].)

16

Notice how in each of these cases, the defendant *actually waived* jury trial. The question was simply whether some deficiency in the advisement might have affected a decision the defendant had already made. Here, though, defendant never waived his right to a jury trial on the special circumstance allegation. Without a waiver, "it is impossible for [a defendant] to establish what he would have done at the time," and thus one "can only speculate now about what he would have done then." (*State v. Little* (Minn. 2014) 851 N.W.2d 878, 885, fn. 3; accord, *State v. Hauk* (Wis.Ct.App. 2002) 652 N.W.2d 393, 403-404 [distinguishing between the situation "when a defendant has waived the right to a jury but the colloquy was deficient" and the situation " 'where a defendant has not made a waiver that is personal and otherwise valid in terms of statutory and case law' "].) In the absence of a waiver, "[t]here is no *object*, so to speak, upon which harmless-error scrutiny can operate." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 280.)[2]

In part because defendant actually waived jury trial in all these situations, the analysis in these misadvisement cases did not demonstrate that harmless error analysis was *possible* — instead of merely conveying that the applicable doctrine

---

[2]    Notice how precisely the opposite is true of the failure to readvise an unrepresented defendant, who has *already* knowingly and voluntarily waived counsel, of the right to counsel at the time of arraignment under section 987, subdivision (a). A reviewing court can easily determine whether the failure to *readvise* a defendant about the right to counsel and to obtain a renewed waiver of that right was prejudicial where (1) a magistrate has already advised the defendant about the right to counsel and cautioned the defendant about the pitfalls of self-representation at the preliminary hearing as well as trial, and (2) the defendant expressed an understanding of the risks and a desire nonetheless to proceed without the assistance of counsel throughout the proceedings. (*People v. Crayton* (2002) 28 Cal.4th 346, 364-366.) That's a far cry from what occurred here, though. Defendant was never advised of — and never waived — his right to have a jury determine the truth of the special circumstance allegation in the first place. Nor does he claim that he ought to have been readvised of his jury trial right before the trial court began the special circumstance phase.

17

for examining the claim (whether plain error or ineffective assistance of counsel) required it in the situations before the court. Indeed, in *U.S. v. Williams*, *supra*, 559 F.3d 607, which reviewed a challenge to the jury waiver only for plain error, the court readily admitted there was "no way to assess [the defendant's] mental state on this record" and that "the burden of production and persuasion [for plain error] dictates the outcome." (*Id.* at p. 613; cf. *State v. Little*, *supra*, 851 N.W.2d at pp. 883-884 [finding plain error in the trial court's failure to obtain a personal jury waiver after the charging document was amended, rendering it unnecessary to decide whether the error was structural].) In *Commonwealth v. Mallory*, *supra*, 941 A.2d at page 698, the court explained that "[w]hen a presumptively-valid waiver is collaterally attacked under the guise of ineffectiveness of counsel, it must be analyzed like any other ineffectiveness claim," including an assessment of whether the defendant suffered prejudice from counsel's deficient performance. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694; cf. *In re Alvernaz* (1992) 2 Cal.4th 924, 937 [requiring prejudice for an ineffective assistance claim arising from misadvisement relating to a plea bargain]; *Taylor v. Horn*, *supra*, 504 F.3d at p. 450 [requiring prejudice for an ineffective assistance claim arising from a failure to waive jury at a penalty trial].)[3]

In contrast, here the trial court failed entirely "to obtain a valid jury waiver." (*Blackburn*, *supra*, 61 Cal.4th at p. 1134.) Never before have we examined whether the defendant *would have* waived the right to a jury had he actually been offered the opportunity to choose. In *Ernst*, for example, the

---

[3] The high court granted certiorari last fall to decide whether a defendant asserting ineffective assistance of counsel that results in structural error must establish prejudice from the ineffectiveness. (*Commonwealth v. Weaver* (Mass. 2016) 54 N.E.3d 495, cert. granted *sub nom. Weaver v. Massachusetts* (2016) ___ U.S. ___ [137 S.Ct. 809].)

18

defendant was present in court when his attorney announced " 'we're prepared to waive a jury as to both phases of the trial [guilt and sanity] at this time, and my client is prepared to go on the record to that effect' "; when his attorney subsequently stated that " 'We are prepared to waive jury as to both issues' "; and when the trial court declared " 'Jury waived by both sides. It's been done. [¶] Is this going as a nonjury case?' " and "[b]oth sides responded affirmatively." (*Ernst*, *supra*, 8 Cal.4th at p. 444.) We unanimously rejected the People's invitation to examine the totality of the circumstances and "find, under that test, that defendant validly waived his right to a jury trial despite his failure to do so expressly." (*Id*. at p. 448.) Similarly, in *People v. Collins* (2001) 26 Cal.4th 297, where we found a jury waiver involuntary because the trial court had advised the defendant he would receive " 'some benefit' " by forgoing a jury trial, we did not inquire whether the defendant would have waived jury trial in the absence of the unspecified benefit. (*Id*. at p. 302, italics omitted.) In both instances, the failure to obtain a proper jury waiver was structural error that defied harmless error analysis. (*Ernst*, at pp. 448-449; *Collins*, at pp. 310-313.) The same is true here.

Practical considerations also distinguish the misadvisement cases from the situation now before us. In the misadvisement context, we assign the burden to demonstrate prejudice to the defendant because of the ease by which a defendant might assert, after the fact, that virtually any kind of misadvisement induced the defendant's jury waiver (or plea), and the difficulty in refuting such a claim. (See *In re Alvernaz*, *supra*, 2 Cal.4th at p. 938; accord, *Commonwealth v. Houck*, *supra*, 948 A.2d at pp. 788-789.) But the issue here is more subtle: not whether defendant would have made the same choice had he been properly advised, but what choice he might have made had he actually been offered the opportunity to choose. Just as we do not inquire (after the fact) whether a defendant would have entered a plea to an offense for which the defendant was never asked to enter a

plea, we do not inquire (after the fact) whether a defendant would have waived jury trial when the defendant was never presented with the opportunity to waive it.

The majority finds it significant — in fact, determinative — that defendant entered *some* kind of jury waiver, and seeks to relegate the remainder of defendant's claim to a dispute about the adequacy of the advisement he received. (Maj. opn., *ante*, at p. 40.) But the defect here goes well beyond merely an error in the advisement. This is not a situation like *Berutko*, where the defendant was unaware that his jury waiver as a matter of law included a waiver of jury as to the prior conviction allegation. The jury waiver here did *not*, as a matter of law, include a waiver of his right to a jury trial *as to the special circumstance*. Under California law, the right to a jury trial for the special circumstance is divisible from the other jury trial rights — and unless there is "a 'separate, personal' waiver of the right to a jury for a special circumstance allegation, above and beyond the standard guilt phase and penalty phase waiver" (maj. opn., *ante*, at p. 28), the defendant is entitled to a jury trial on the special circumstance allegation. (§ 190.4, subd. (a).) Thus, despite a waiver of jury at the guilt phase, "the trial court *must presume* the defendant wants a jury" to try the subsequent phases of a capital trial. (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1026, italics added.) The majority's harmless error test, which places the burden on a defendant who has waived a jury at the guilt phase to show that he would not have waived jury trial at a subsequent phase, improperly nullifies the effect of that presumption.

The majority also contends that nothing in the language, structure, or context of section 190.4, subdivision (a) would support the conclusion that the failure to obtain a separate, personal waiver constitutes structural error. (Maj. opn., *ante*, at pp. 32.) I disagree. In four different sentences, section 190.4 emphatically declares that the trier of fact "shall be a jury, unless a jury is waived," notwithstanding a waiver of jury (or entry of a plea) at a prior phase.

20

Moreover, the language guaranteeing a jury trial for the special circumstance allegation tracks almost verbatim the language guaranteeing a jury trial for the penalty determination. (Compare § 190.4, subd. (a) with *id*., subd. (b).) There is thus no indication that the Legislature in 1977, or the voters in 1978, wanted to extend a lesser form of protection to the jury trial right for special circumstances than to the jury trial right for the penalty determination. Surely the majority does not mean to suggest that the failure to obtain a capital defendant's jury waiver for the penalty trial would necessarily be harmless under section 190.4, unless the defendant could demonstrate that he would not have waived jury trial had he been offered the opportunity.

The language used in section 190.4 also differs substantially from those statutory provisions supporting the general rule " 'that where a defendant waives a jury trial he is deemed to have consented to a trial of all of the issues in the case sitting before the court sitting without a jury.' " (Maj. opn., *ante*, at p. 21; cf. *People v. Vera* (1997) 15 Cal.4th 269, 277 [applying the general rule "[w]here the whole cause — substantive offenses and sentencing allegations — is tried in a *unitary* proceeding . . . ." (italics added)].) By creating a completely different structure for the death penalty law — one much more protective of a defendant's right to a jury trial — the Legislature and the voters signaled that a defendant's right to a jury trial for the special circumstance and penalty phases merited more respect than a defendant's right to a jury trial on a mere sentencing allegation or enhancement. A rule rendering the failure to elicit a separate, personal jury waiver invariably harmless on appeal would plainly undermine the statute's purpose.

What section 190.4 does is set an exacting standard for the waiver of a jury at each step of a death penalty proceeding — and for good reason. Protecting the constitutional right to a jury trial in a death penalty proceeding is the responsibility of this court. So is ensuring that statutory protections for that right enacted by the

21

Legislature and the voters are effective, and enforced.  As the majority falls short in this task, I respectfully dissent from the judgment affirming the special circumstance finding and the death judgment.

**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Sivongxxay

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S078895
**Date Filed:** June 19, 2017

_____

**Court:** Superior
**County:** Fresno
**Judge:** Gene M. Gomes

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Douglas Ward, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Sean M. McCoy, Ryan B. McCarroll and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Douglas Ward
Deputy State Public Defender
P.M.B. #199, 350 Bay Street
San Francisco, CA  94133
(415) 494-9252

Lewis A. Martinez
Deputy Attorney General
2550 Mariposa Mall, Room 5090
Fresno, CA  93721
(559) 477-1677